William B. Sullivan [CSB No. 171637]
helen@sullivanlawgroupapc.com
Eric K. Yaeckel [CSB No. 274608]
yaeckel@sullivanlawgroupapc.com
Ryan T. Kuhn [CSB No. 324538]
ryan@sullivanlawgroupapc.com
**SULLIVAN & YAECKEL LAW GROUP, APC**
2330 Third Avenue
San Diego, California 92101
phone: (619) 702-6760 | fax: (619) 702-6761

Derik N. Lewis (SBN 219981)
dlewis@VantisLaw.com
**VANTIS LAW FIRM, APC**
120 Vantis Drive, Suite 300
Aliso Viejo, California 92656
phone: (949) 216-0935 | fax: (949) 296-0935

Attorneys for Plaintiffs
David Seymour and Elle Seymour

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID SEYMOUR, an individual, and ELLE SEYMOUR, an individual;<br><br>                Plaintiffs,<br><br>        vs.<br><br>FAY SERVICING, LLC, a Delaware limited liability company; FIRST AMERICAN TITLE INSURANCE COMPANY, a California corporation; and DOES 1 through 10, Inclusive,<br><br>                Defendants. | Case No. 2:21-cv-01666-PSJ-AS<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR:**<br><br>1) **VIOLATIONS OF REGULATION X OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT (SERVICER)**<br>2) **VIOLATIONS OF CALIFORNIA'S HOMEOWNER BILL OF RIGHTS (SERVICER)**<br>3) **VIOLATIONS OF CALIFORNIA'S HOMEOWNER BILL OF RIGHTS (TRUSTEE)**<br>4) **VIOLATIONS OF THE FEDERAL FAIR DEBT COLLECTION PRACTICES ACT (SERVICER)** |

1

**FIRST AMENDED CLASS ACTION COMPLAINT**

5) **VIOLATIONS OF THE FEDERAL FAIR DEBT COLLECTION PRACTICES ACT (TRUSTEE)**
6) **VIOLATIONS OF THE CALIFORNIA ROSENTHAL ACT (SERVICER)**
7) **VIOLATIONS OF THE CALIFORNIA ROSENTHAL ACT (TRUSTEE)**
8) **NEGLIGENT LOAN SERVICING**
9) **UNFAIR PRACTICES UNDER CALIFORNIA BUSINESS & PROFESSIONS CODE SECTION 17200, ET SEQ.**

(DEMAND FOR JURY TRIAL)

Date Action Filed: January 12, 2021
Trial Date:  Not Set

Plaintiffs David Seymour and Elle Seymour (*"Plaintiffs"*) bring this proposed class action complaint, individually, and on behalf of other members of the general public similarly situated, against FAY SERVICING, LLC, FIRST AMERICAN TITLE INSURANCE COMPANY, and DOES 1 through 10 inclusive (*"Defendants"*), and each of them, and allege as follows:

## THE PARTIES

1.     Plaintiffs are and were at all times material hereto individuals residing in Santa Barbara County, California.  Plaintiffs own the residential real property commonly known as 3077 Santa Ynez Ave., Santa Ynez, CA 93460, APN 141-330-044 (the *"Property"*) and have at all relevant times occupied that property as Plaintiffs' principal residence.  At all times material hereto, Plaintiffs were over the age of 65.

2.     Plaintiffs are informed and believe and based thereon allege that Defendant FAY SERVICING, LLC. (collectively with Does 1-3, *"Servicer"* or *"Fay Servicing"*) is, and at all times relevant herein was, a limited liability company

organized and existing in the State of Delaware and doing business throughout the State of California, and at all times relevant herein was actively engaged in the business of making, arranging, holding and/or servicing loans, in Santa Barbara County, California and/or involving real properties located in Santa Barbara County, California.

3.    Plaintiffs are informed and believe and based thereon allege that Servicer conducted within the most recent regulatory reporting period, more than 175 foreclosures on residential real properties of four or fewer dwellings located in California.

4.    Plaintiffs are informed and believe and based thereon allege that Servicer and its affiliated service more than 5,000 mortgage loans.

5.    Plaintiffs are informed and believe and based thereon allege that Defendant FIRST AMERICAN TITLE INSURANCE COMPANY (collectively with Does 4-6, *"Trustee"* or *"First American"*) is, and at all times relevant hereto was, a corporation organized and existing under the laws of the State of Nebraska and doing business in the State of California, actively engaged in the business of acting as a trustee under Deeds of Trust secured by real property in Santa Barbara County, California and/or involving real properties located in Santa Barbara County, California.

6.    The true names and capacities, whether individual, corporate, associate or otherwise, of the defendants named herein as DOES 1 through 10, inclusive, are unknown to Plaintiffs at this time, and DOES 1 through 10 are therefore sued by such fictitious names.   Plaintiffs will, with leave of court if required, amend this complaint to set forth the true names and capacities of such fictitiously-named defendants when the same have been ascertained.   Plaintiffs are informed and believe and based thereon allege that each such fictitiously-named defendant is responsible in some manner for the acts and occurrences hereinafter alleged.

**FIRST AMENDED CLASS ACTION COMPLAINT**

7. Plaintiffs are informed and believe and based thereon allege that, at all times herein mentioned, each of the Defendants, including the DOE Defendants, was the agent, servant, officer, representative, employee and/or alter-ego of each of the remaining Defendants and was at all times acting within the course and scope of such relationship, or was in some way the cause of Plaintiffs' harm and injury.

8. Servicer, Trustee and DOES 1-10 are collectively referred to herein as *"Defendants."*

## MORTGAGE SERVICING BACKGROUND

9. Fay Servicing and First American are participants in the residential mortgage market, which is the largest market for consumer financial products in the United States with over $10 trillion in loans outstanding. Mortgage servicers like Fay Servicing play a critical role in the mortgage market, manning the front lines in the day-to-day management of mortgage loans for banks, lenders and investors. The majority of mortgage loans serviced by mortgage servicers are owned by investors of securitized loans.

10. Servicers, like Fay Servicing, are responsible for sending monthly mortgage statements, collecting and distributing mortgage payments, maintaining and disbursing funds from escrow accounts for payment of insurance and property taxes, reporting to creditors and investors, and interacting with borrowers regarding servicing questions and concerns.

11. Services are also specifically responsible for administering collection efforts after a borrower default and pursuing foreclosure, as well as overseeing and implementing loss mitigation programs and foreclosure preventions options to assist borrowers in avoiding default, delinquency and foreclosure.

12. Mortgage servicing can be performed by banks or non-bank entities depending on the mortgage product and business model.  Some lenders make loans and conduct all the servicing on those loans.  Other lenders will sell their interest in the mortgage loans but retain the servicing rights to collect the fees as a servicing

business.  In other cases, mortgage servicers have no role in loan origination or ownership at all and simply service mortgages for third-party lenders.  These third-party mortgage servicers are hired to either service mortgages in a lender's portfolio or they can purchase the mortgage servicing rights on securitized loans.

13.    The rights of the mortgage servicer and the owner of the mortgage are contained in written servicing agreements between the parties.  These servicing contracts may specify the circumstances under which a mortgage servicer may offer loan modifications to borrowers.  However, these servicing contracts are subject to state and federal laws, rules and regulations regarding mortgage servicing and loss mitigation processing.

14.    Compensation models for mortgage servicing may vary, but servicers generally recoup their investment in purchasing servicing rights and earn a profit through the following: (i) a net servicing fee, which is usually expressed as a constant rate assessed on unpaid mortgage balances; (ii) interest float on escrow accounts prior to disbursement; (iii) charging and collecting fees allowed under the mortgage documents or for administrative functions such as responding to borrower requests, and (iv) marketing other products and services to borrowers.

15.    Under this compensation model, servicers, like Fay Servicing, are effectively compensated for functioning as collectors and processors with little attention to customer service or borrower satisfaction.  Furthermore, borrowers have no ability to select or change servicers and therefore have little sway in the functions or service levels of these servicers.  Servicers simply compete for business by offering loan owners lower pricing on the servicing performed and, in doing so, reduce the available financial resources to allocate toward borrower satisfaction and regulatory compliance.

16.    Intensifying the divide between a servicer's motivation for profits and the borrower's desire for better service is the often-unknown fact that servicers earn additional revenue from various fees assessed on borrowers such as late fees and

administrative functions like providing payoff statements, processing direct payments and other borrower-initiated services. Therefore, servicers have an incentive to seek out opportunities to impose fees on the borrower.

17. The inherent conflicts of interest and extreme pressure related to higher volumes and lower pricing in the mortgage servicing industry came to a head when the real estate market imploded in 2007-2008. After the 2007-2008 global financial crisis, and during the resulting Great Recession, the number of mortgage defaults in the United States surged to historic levels. Servicers were unable to handle the eruption of delinquent loans, mortgage modification requests, and foreclosures. Delinquency rates nearly doubled from 2007 to 2010 and servicers had inadequate procedures and infrastructure to handle the upturn. Mortgage servicers were flooded with loss mitigation requests from struggling borrowers.

## LOSS MITIGATION DURING
## THE GREAT RECESSION

18. A loss mitigation request is a plea for help from a borrower in financial difficulty who needs accommodation on his or her mortgage to avoid delinquency, default and/or foreclosure. Loss mitigation can take various forms ranging from temporary forbearance to more permanent changes in the interest rate, loan balance or length of repayment, all with the intent of allowing the borrower to retain ownership of their home. In situations where the borrower is no longer able to afford the home, loss mitigation can still assist in avoiding a punishing foreclosure by pursuing a short sale or deed-in-lieu of foreclosure.

19. During this time, servicers lacked the experience and manpower to adequately address the surge of mortgage defaults and resulting tsunami of loss mitigation requests. The industry-wide deficiencies of mortgage servicers resulted in a number of enforcement actions by federal and state regulators. The failures in mortgage servicing led to various problems for borrowers. Borrowers were unable to obtain information about loss mitigation programs and foreclosure avoidance

options. Servicers were unable to process applications for loss mitigation in a timely manner and homeowners ended up in foreclosure and losing their homes by the thousands. Many times, foreclosure proceedings were commenced without proper documentation and without adequate resources to administer the foreclosure process. Servicers also failed to sufficiently oversee third-parties handling foreclosure- related services.

20. Caving into the pressure to process more and more foreclosures, the nation's largest servicers instituted a practice now known as "Robo-signing" whereby servicers improperly had employees sign foreclosure filings en masse to speed up the processing without knowing if those documents were correct. In February 2012, the federal government, 49 state attorneys general and the District of Columbia, entered into the largest consumer financial protection settlement in U.S. history with what were then the nation's five largest mortgage servicers. This "National Mortgage Settlement" provided over $50 billion in relief to distressed borrowers harmed by the wrongful foreclosures and direct payments to the states and the federal government. Similar settlements and consent orders with Federal regulators were later made with many other servicers (including Defendant Fay Servicing, LLC in 2017).

21. The Federal government also instituted programs like the Home Affordable Modification Program (HAMP), which provided eligible borrowers with an opportunity to modify their mortgage loans to make them more affordable. Servicers were eligible for incentive payments for participating in HAMP.

22. Despite these enforcement actions and incentive programs, state and federal regulators were still concerned that the mortgage servicing industry was not adequately looking out for the rights of borrowers facing financial difficulties.

7

**FIRST AMENDED CLASS ACTION COMPLAINT**

## REGULATION X OF THE REAL ESTATE
## SETTLEMENT PROCEDURES ACT

23.     The Real Estate Settlement Procedures Act of 1974 (*"RESPA"*) was originally enacted by Congress based on findings that reforms to the real estate settlement process were necessary to ensure that consumers were provided with greater information on the settlement process and to protect consumers against unwarranted settlement charges.  The law was amended in 1990 to cover persons responsible for servicing federally-related mortgage loans and imposed certain obligations on such servicers.

24.     During the Great Recession, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the *"Dodd-Frank Act"*) which transferred rulemaking authority under RESPA to the Consumer Financial Protection Bureau (*"CFPB"*).  The Dodd-Frank Act also added a section to RESPA giving the CFPB the authority to establish rules on servicers of federally-related mortgage loans for the purpose of carrying out the consumer protection goals of RESPA.

25.     In January 2013, the CFPB issued several final rules to address the systemic problems in the mortgage servicing industry described above and to implement protections for borrowers with regard to mortgage servicing and loss mitigation.  These rules amended 12 C.F.R. Part 1024, RESPA (Regulation X).  The new rules became effective on January 10, 2014.

26.     Specifically, the new rules implemented procedural protections for borrowers with regard to the process of obtaining an evaluation for loss mitigation options and restrictions on the foreclosure process while a borrower is being evaluated for a loss mitigation option. See 12 C.F.R. § 1024.41.  Servicers are prohibited from instituting foreclosure proceedings until a borrower's mortgage loan is more than 120 days delinquent.  *Id.* at § 1024.41(f)(1). Further, Servicers are prohibited from the practice of "dual tracking" which is the practice of initiating foreclosure proceedings while a loss mitigation application is being processed. *Id.* at

**FIRST AMENDED CLASS ACTION COMPLAINT**

§ 1024.41(f), (g). Regulation X forbids foreclosure on a borrower's home until the mortgage servicer has *evaluated the borrower for all loss mitigation options*. 12 C.F.R. § 1024.41(c) & (g).

27. If a borrower submits a facially complete loss mitigation application before the servicer has started the foreclosure process, then the servicer is prohibited from taking any action in the foreclosure process until the servicer has sent the borrower the notice required by 12 C.F.R. § 1024.41(c)(1)(ii) and the borrower either did not appeal the notice or the borrower's appeal has been denied. *Id.* at § 1024.41(f)(2), (g).

28. RESPA requires servicers to follow strict procedures for processing loss mitigation applications and to disclose certain information to borrowers about the status of their application. See 12 C.F.R. § 1024.41. The rules also afford consumers a private right of action against servicers that fail to comply.

29. On June 23, 2020, in response to the Covid-19 pandemic, the CFPB issued an Interim Final Rule (IFR) amending Regulation X's Loss Mitigation Procedures to allow mortgage servicers certain exemptions to the strict requirements triggered upon receiving an application for loss mitigation from a borrower. The new "Anti-Evasion Exception" become effective July 1, 2020. 12 C.F.R. § 1024.41(c)(2)(v)(A). This Anti-Evasion Exception offers servicers a temporary exception to the RESPA requirement to "exercise reasonable diligence in obtaining documents and information to complete a loss mitigation application," 12 CFR 1024.41(b)(1).

## CALIFORNIA'S HOMEOWNER BILL OF RIGHTS

30. In 2012, the California state legislature enacted a series of statutes known as the Homeowner Bill of Rights (***"HBOR"***), effective January 1, 2013, which were meant to ensure fair loan servicing and loss mitigation practices for California homeowners who were in default and facing foreclosure. The laws are designed to guarantee basic fairness and transparency by including restrictions on

1  "dual tracking" (the act of reviewing the borrower for a modification while
2  concurrently processing a foreclosure), requiring the servicer to provide a "single
3  point of contact" for the borrower throughout the entire loss mitigation process until
4  *all foreclosure prevention alternatives have been exhausted*, requiring lenders and
5  servicers to verify foreclosure documents before recording the same, and providing a
6  private right of action to borrowers so they can enforce their HBOR rights.  Pursuant
7  to HBOR's private right of action, Plaintiffs have standing to bring an action to
8  enforce the provisions found in Cal. Civ. Code §§ 2923.55, 2923.6, 2923.7, 2924.9,
9  2924.10, 2924.11 and 2924.17. *See* Cal. Civ. Code § 2924.12(a)(1).

10  ## FAY SERVICING, LLC

11  31.   Fay Servicing, LLC, is a wholly owned subsidiary of Fay Financial,
12  LLC, is a third-party mortgage servicer which was incorporated in 2008.  Fay
13  Servicing is headquartered in Chicago, with additional offices in Illinois, Texas and
14  Florida. Fay Servicing's servicing business is focused on handling non-performing
15  and distressed mortgage loans which are in default or even in foreclosure.  Fay
16  Servicing is licensed to service mortgages in all 50 states and the District of
17  Columbia.  The company is an approved FNMA servicer, FHLMC seller/servicer,
18  GNMA issuer and HUD servicer.

19  32.   Fay Servicing focuses on securing the servicing rights for large
20  portfolios with a high volume of nonperforming and distressed mortgage loans.  Fay
21  Servicing seeks out these defaulted mortgage loans and the profits that result from
22  servicing those difficult assets.

23  33.   According to Fitch Ratings, as of March 31, 2020, Fay Servicing was
24  servicing more than 105,500 loans totaling $19.6 billion, including more than 26,000
25  special serviced loans totaling $5.16 billion.  Fay Servicing's staff grew to 630 full-
26  time employees as of March 31, 2020 up from 589 as of March 31, 2019.  (See
27  https://www.fitchratings.com/research/banks/fitch-affirms-fay-servicing-us-rmbs-
28

servicer-ratings-outlook-negative-18-08-2020). Fay Servicing also utilizes "off-shore third-party vendors" that provide customer support and borrower interaction.

34.   From the Fay Servicing website: "Fay Financial, a mortgage servicer that specializes in managing at-risk residential mortgage loans, has been ranked #14 on the Crain's Fast 50 list after being named an honoree in May. Fay Financial's 926% five-year revenue growth rate has placed it among the top of the quickest growing companies in Chicago." (See https://www.fayservicing.com/2018/07/14/fay-ranks-14th-on-crains-fast-50-list/).

35.   On April 28, 2020, Fay Servicing secured between $5M-$10M in Coronavirus bailout funds from the Paycheck Protection Program to keep employees working during the coronavirus pandemic and to ensure that operations and compliance with the law would not be disrupted.  Fay Servicing reported 500 jobs and received approval of PPP funds on April 28, 2020. (See: https://projects.propublica.org/coronavirus/bailouts/loans/fay-servicing-llc-e123ac490c6fb7cb2eea8e102a7c4430).  Therefore, Fay Servicing should have been able to properly address Plaintiffs' loss mitigation request during the Covid-19 pandemic without disruption to its staffing.

**FAY SERVICING'S PATTERN AND PRACTICE OF VIOLATING LOSS MITIGATION RULES AND REGULATIONS**

36.   In 2017, the CFPB took action against Fay Servicing for failing to provide mortgage borrowers with the protections against foreclosure that are required by law. According to the CFPB, "[t]he Bureau found that Fay violated the CFPB's servicing rules by keeping borrowers in the dark about critical information about the process of applying for foreclosure relief. The Bureau also found instances where the servicer illegally launched or moved forward with the foreclosure process while borrowers were actively seeking help to save their homes. The CFPB has ordered Fay Servicing to stop its illegal practices and pay up to $1.15 million to harmed

borrowers." These are almost identical allegations to the Plaintiffs' experience with Fay Servicing as alleged herein.

37. As of the date of this Complaint, Fay has failed to bring its system for processing loss mitigation applications into compliance with RESPA and the associated laws under HBOR. As described in detail below, Fay Servicing has a pattern and practice of failing to provide proper notices and information required by RESPA and HBOR, failing to process loss mitigation applications within the time frames set forth under RESPA and HBOR, failing to keep track of basic documentation in the loss mitigation process, failing to provide borrowers a single point of contact, and failing to provide borrowers with critical protections afforded under RESPA and HBOR.

38. Plaintiffs and members of the proposed classes allege Defendants violated the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601-2617, its implementing regulations, 12 C.F.R. §§ 1024.1-1024.41, and California's Homeowner Bill of Rights ("HBOR"), Cal. Civ. Code §2923.5 *et seq*.

39. Plaintiffs and members of the proposed classes submitted loss mitigation applications under RESPA and HBOR. Defendants violated RESPA and HBOR by failing to adhere to the requirements of 12 C.F.R. §§ 1024.40-1024.41 and Cal. Civ. Code §§ 2923.6, 2923.7, 2924.10, 2924.11 and 2924.17 with respect to the Plaintiffs and class members' loss mitigation applications.

**PRELIMINARY ALLEGATIONS - NAMED PLAINTIFFS' FACTS**

40. Plaintiffs purchased the Property in 1999 and took title pursuant to a Grant Deed recorded on July 14, 1999, in official records of Santa Barbara County, California (the ***"Official Records"***) as document number 1999-0057461. A true and correct copy is attached as "**Exhibit A**."

41. On or about December 13, 2006, Plaintiff executed a promissory note (***"Note"***) evidencing a loan made to Plaintiff in the amount of $735,000 (the ***"Loan"***) which is secured by a deed of trust (the ***"Deed of Trust"***) encumbering the

Property and recorded in the Official Records on December 20, 2006 as document number 2006-0098601. A true and correct copy is attached as "**Exhibit B**."

42.    The Loan was made for Plaintiffs' personal, family or household purposes and is a first-lien mortgage secured by Plaintiffs' owner-occupied principal residence.

43.    The original trustee under the Deed of Trust was Golden West Savings Association Service Co., a California corporation. (***"Original Trustee"***).    The original lender and beneficiary under the Deed of Trust was World Savings Bank, FSB. (***"Original Lender"***).

44.    At some point after 2006, the Original Lender and all of its assets, including the Loan, were purchased or otherwise acquired by Wells Fargo Bank, N.A. and, as of January 2020, the Loan was held and owned by "Wells Fargo Bank, N.A., S/B/M to Wells Fargo Bank Southwest, N.A., F/K/A Wachovia Mortgage, FSB, F/K/A World Savings Bank, FSB."

45.    On or about February 19, 2020, Wells Fargo Bank, N.A. sold the Loan and assigned the Deed of Trust to "US Bank Trust, N.A., not in its individual capacity but solely as owner trustee for VRMTG Asset Trust" (***"Lender"***) pursuant to that certain Assignment of Deed of Trust recorded in the Official Records on February 24, 2020 as document number 2020-0009168. A true and correct copy is attached as "**Exhibit C**."

46.    On or about February 19, 2020, at a time when Plaintiffs' Loan was past due and in default, Lender engaged Fay Servicing as the mortgage servicer for the Loan.   Thereafter, Lender replaced the Original Trustee and substituted in First American as the new Loan Trustee pursuant to that certain Substitution of Trustee recorded in the Official Records as document number 2020-0056476.

1
2

***BORROWER FINANCIAL DIFFICULTIES***
***AND MORTGAGE DEFAULT***

3    47.    David and Elle Seymour, both in their 70's, have faced and overcome
4   significant challenges in their lives.  Elle Seymour, a retired Los Angeles police
5   officer, is a cancer survivor.  Although Elle survived her fight with cancer years ago,
6   she was left with a compromised immune system and diabetes after removal of a
7   number or organs in her cancer battle. Elle then suffered a stroke in February 2019
8   but, as a stronger fighter, was making a great recovery until she was the victim of a
9   head-on collision at the end of March 2019.  Left with mild brain damage, Elle has
10   been in a fragile medical and emotional state ever since, yet she continues to stay
11   strong and build on her recovery.  David Seymour runs his own general contracting
12   business while also being the primary care giver for his wife.  Medical issues and
13   caring for his wife took precedence for David over the past few years and his
14   business suffered as a result.

15    48.    At the time Fay Servicing took over the mortgage servicing duties on
16   Plaintiffs' Loan in February 2020, Plaintiffs were already two months' behind on
17   their mortgage payments.  Then, when things seemed to be at their worst for Mr. and
18   Mrs. Seymour, the Country got hit with the Coronavirus pandemic and the State of
19   California essentially shutdown.  By March 2020, the pandemic seriously affected
20   David's business and livelihood and Plaintiffs were suffering financially, medically,
21   and emotionally.  In early 2020, David reached out to his Servicer for assistance with
22   his mortgage payments.

23    49.    On February 27, 2020, an unknown person at Fay Servicing sent
24   Plaintiffs a Fair Debt Collections Practices Act Validation Notice (***"FDCPA***
25   ***Notice"***). A true and correct copy is attached as "**Exhibit D**."

26    50.    The FDCPA Notice specifically states that "Fay Servicing LLC is a debt
27   collector, and information you provide to us may be used to collect a debt." Further,
28   Fay Servicing states in the letter that it is "collecting the debt on behalf of: US Bank

Trustee National Association[.]" The letter indicates that the debt is past due with an unpaid accrued interest amount of $7,982.99 and late charges of $1,119.66.

51.     On February 27, 2020, an unknown person at Fay Servicing sent Plaintiffs a form letter offering various loss mitigation options (***"Form Loss Mitigation Letter"***).  A true and correct copy is attached as "**Exhibit E**."

52.     The Form Loss Mitigation Letter specifically states that "Fay Servicing LLC is a debt collector, and information you provide to us may be used to collect a debt." Further, The Form Loss Mitigation Letter warns that for borrowers in California, a full and complete loss mitigation application "must be received at least seven (7) days before a scheduled foreclosure sale in order for a borrower to be eligible for loss mitigation options."  This purported deadline is false and is contrary to the requirement under HBOR that mortgage servicers must review all loss mitigation applications which are received at least 5 business days prior to a scheduled foreclosure.

53.     On February 28, 2020, David Seymour called Fay Servicing and was connected with Greg Hunter.  Mr. Seymour stated that he wanted to make a payment on his Loan.  Mr. Hunter confirmed that Plaintiffs were past due on the Loan by two payments along with a number of late fees.  Mr. Seymour completed the process to make one of the two outstanding payments.  Mr. Seymour stated that the interest rate on his Loan was too high and was causing a financial burden and that Plaintiffs needed mortgage assistance.  Mr. Hunter did not offer any loss mitigation options to Plaintiffs.

54.     On March 16, 2020, David Seymour called Fay Servicing and was connected with Jack Kling.  Mr. Seymour stated that he wanted to make a payment on his Loan.  Mr. Kling confirmed that Plaintiffs were still past due on the Loan by two payments.   Mr. Seymour completed the process to make one of the two outstanding payments.  Mr. Seymour stated that the interest rate on his Loan was too high and was causing a financial burden and that Plaintiffs needed mortgage

**FIRST AMENDED CLASS ACTION COMPLAINT**

assistance.  Mr. Seymour also explained the medical issues his wife was facing.  Mr. Seymour stated that he was attempting a modification with Wells Fargo at the time the Loan was transferred to Fay Servicing.

### *FAILURE TO PROPERLY ASSIGN AND*
### *KEEP A VALID SINGLE POINT OF CONTACT*

55.    Pursuant to 12 C.F.R. § 1024.40, Fay Servicing was required to designate a point of contact (a *"POC"*) to Plaintiffs' Loan within 45 days of the first missed payment and to make such POC available to Plaintiffs via telephone.  The POC was required to provide Plaintiffs with accurate information about the loss mitigation options available and the actions required to be evaluated for such loss mitigation.  The POC was required to provide Plaintiffs with accurate information about the status of any loss mitigation application that was submitted to the Servicer.

56.    Plaintiffs are informed and believe and thereon allege that Fay Servicing did not timely designate a POC to Plaintiffs' Loan or, if such a POC was timely assigned, Fay Servicing failed to timely notify Plaintiffs of the same and thereafter systematically failed to make such POC available to Plaintiffs via telephone.  The various and numerous employees which Servicer did make available to Plaintiffs failed to provide Plaintiffs with accurate information about the loss mitigation options available and the actions required to be evaluated for such loss mitigation. Further, those employees also failed to provide Plaintiffs with accurate information about the status of Plaintiffs' loss mitigation application that was submitted to the Servicer.

57.    On May 4, 2020, Servicer sent Plaintiffs a letter entitled "Notice of Default and Intent to Accelerate" (the *"Default Letter"*). A true and correct copy is attached as **Exhibit F**."

58.    The Default Letter stated that "Fay Servicing, LLC is a debt collector, this is an attempt to collect a debt and any information obtained will be used for that purpose."  The Default Letter stated that Plaintiffs were in default on the Loan and

**FIRST AMENDED CLASS ACTION COMPLAINT**

directed them to contact Tosha Crockrell at 1-800-495-7166 which Fay Servicing designated as Plaintiffs' ***"single point of contact"*** (the ***"SPOC"***).  The Default Letter specified that the amount to cure the default was $14,559.93 and failure to pay that amount may result in foreclosure sale of the property.

59.    From and after receipt of the May 4, 2020, Default Letter, Plaintiffs were never able to make direct contact with the purported SPOC, Tosha Crockrell. In fact, Plaintiffs were forced to speak with a new person on nearly every contact with Fay Servicing regarding their loss mitigation options.   The list persons who were assigned to and/or handled Plaintiffs' loss mitigation process includes, but is not limited to:

|     |     |
| --- | --- |
| a. | Tosha Crockrell (original SPOC – never spoke with) |
| b. | Trecia Smith (replacement SPOC –spoke with once) |
| c. | Tamica |
| d. | Elle |
| e. | March 16, 2020 – Jack Kling |
| f. | May 12, 2020 – Greg Hunter |
| g. | May 21, 2020 – Carlos Castillo |
| h. | May 22, 2020 – Desiree Rodriguez |
| i. | May 22, 2020 – Gary Rutenber |
| j. | June 6, 2020 – Bryce Conklin |
| k. | June 8, 2020 – Shanetta Bowen |
| l. | June 16, 2020 – Megan Marshburn |
| m. | June 25, 2020 – Jim Lawlor |
| n. | July 31, 2020 – James Palikan |
| o. | July 31, 2020 – Kedrick Gray |
| p. | August 10, 2020 – Curtis Walker |
| q. | August 18, 2020 – Shanetta Bowen |
| r. | September 1, 2020 – Carlos Castillo |
| s. | September 11, 2020 – Christine Mixon |
| t. | September 16, 2020 – Tom Adler |
| u. | October 14, 2020 – Bryce Conklin |
| v. | October 15, 2020 – Bryce Conklin |
| w. | October 16, 2020 – James Palikan |
| x. | October 16, 2020 – Mary Cabello |
| y. | October 23, 2020 – Kedrick Gray |
| z. | November 16, 2020 – Lou Visconti |
| aa. | December 12, 2020 – Crystal Lujano |

17
**FIRST AMENDED CLASS ACTION COMPLAINT**

bb.    December 24, 2020 – Carlos Lopez
cc.    January 11, 2021 – Bill Delisle
dd.    January 11, 2021 – Kyle Williams

60.    On May 12, 2020, Elle Seymour called Fay Servicing and, rather than being connected with the SPOC, Tosha Crockrell, Mrs. Seymour was connected with Greg Hunter.  Mrs. Seymour specifically stated that she was to be connected with the SPOC, Tosha Crockrell, but Mr. Hunter never attempted to connect the call to Ms. Crockrell.  When pressed about not being connected with the SPOC, Mr. Hunter stated that "Trecia Smith is your account manager" and then proceeded with the call without attempting to connect Mrs. Seymour to the purported new SPOC, Ms. Smith.

### *FAY SERVICING IGNORES HOME RETENTION REQUESTS*
### *AND PUSHES PLAINTIFFS TO SELL THEIR HOME INSTEAD*

61.    On the May 12, 2020 call with Greg Hunter, Mrs. Seymour explained the medical and financial challenges Plaintiffs were facing, stated that Plaintiffs needed mortgage assistance and that they wished to avoid filing for bankruptcy to protect the home.  Rather than attempting to assist Plaintiffs with home retention options, Mr. Hunter pressured Mrs. Seymour to sell the home and asked Mrs. Seymour how much Plaintiffs' home would sell for if listed for sale.

62.    Further, on the May 12, 2020 call with Greg Hunter, Mrs. Seymour stated that the interest rate on Plaintiffs' Loan was too high and that Plaintiffs desperately needed mortgage assistance in order to keep their family's home.  In response to Mrs. Seymour's pleas for help in keeping her home, Mr. Hunter again suggesting selling the home and stating "have you guys considered maybe, you know, downsizing[?] … you might consider, you know, talking to a realtor[.]"

63.    On the May 12, 2020 call with Greg Hunter, Mrs. Seymour asked for a direct number to call Mr. Hunter because she wanted to deal with one person rather than being bounced around among a number of employees that were not familiar with Plaintiffs' file.  Mr. Hunter stated that another person is the account manager.

**FIRST AMENDED CLASS ACTION COMPLAINT**

Mrs. Seymour again stated that she didn't want to start all over again with someone else.  Mr. Hunter again identified Trecia Smith as the account manager but made no reference to any "single point of contact" as requested by Mrs. Seymour.

### FAY SERVICING BEGINS JUGGLING "ACCOUNT MANAGERS" ON PLAINTIFFS LOSS MITIGATION REQUEST

64.     On May 13, 2020, Fay Servicing sent Plaintiffs a letter regarding Plaintiffs' verbal request for loss mitigation assistance during the May 12, 2020 phone call with Mr. Hunter.  A true and correct copy is attached as "**Exhibit G**."

65.     The May 13, 2020 letter falsely states that Plaintiffs had spoken with their "account manager" when requesting loss mitigation assistance on the May 12, 2020 phone call with Mr. Hunter.  Plaintiffs were not allowed to speak with either Ms. Crockrell, the single point of contact, or Trecia Smith, the account manager, on the May 12, 2020 phone call.

66.     The May 13, 2020 letter indicates that Trecia Smith was Plaintiffs' new "account manager" but failed to identify any new "single point of contact" as was previously stated in the May 4, 2020 Default Letter which specifically designated Tosha Crockrell as the "single point of contact."   Plaintiffs are unaware of the difference between Fay Servicing's designation of a "single point of contact" and its designation of a separate "account manager" but the distinction is irrelevant because Plaintiffs were connected with neither a single point of contract nor an account manager.

### FAY SERVICING PROVIDES FALSE AND ERRONEOUS DEADLINES FOR PLAINTIFFS' LOSS MITIGATION REQUEST

67.     The May 13, 2020 letter warns Plaintiffs that, for borrowers in California, a full and complete loss mitigation application "must be received at least seven (7) days before a scheduled foreclosure sale in order for a borrower to be eligible for loss mitigation options."  This purported deadline is false and is contra to the requirement under HBOR that mortgage servicers must review all loss mitigation

applications which are received at least 5 business days prior to a scheduled foreclosure.

68. On May 21, 2020, David Seymour called Fay Servicing and, rather than being connected with the SPOC, Mr. Seymour was connected with Carlos Castillo. Mr. Castillo was not familiar with Plaintiffs' Loan or their prior request for mortgage assistance. Mr. Seymour explained that he wished to make a payment on his Loan and request mortgage assistance. Mr. Castillo stated that Fay Servicing would not a single take payment and that two payments would be required. Mr. Castillo said the account manager is Trecia Smith. Mr. Seymour asked to speak with Ms. Smith but was told she was not available.

69. On May 22, 2020, David Seymour called Fay Servicing in an attempt to speak with the purported SPOC. Rather than being connected with the SPOC, Mr. Seymour was connected with Desiree Rodriguez. Ms. Rodriguez was not familiar with Plaintiffs' Loan or their prior requests for mortgage assistance. Mr. Seymour stated that Trecia Smith was supposed to be handling his account, but he has never been able to speak with her. Mr. Seymour requested payment assistance and asked for more time to make his payment. Ms. Rodriguez says she will connect Mr. Seymour with Trecia Smith, but then stated that Trecia Smith was not available, and the call was then transferred to Gary Rutenber.

70. On May 22, 2020, Mr. Seymour was transferred to Gary Rutenber because the SPOC was not available. Mr. Rutenber was not familiar with Plaintiffs' Loan or their prior requests for mortgage assistance. Therefore, Mr. Seymour explained his entire loan history, financial challenges and family medical issues to Mr. Rutenber. Mr. Seymour explained that he wanted to make a payment on his Loan. Mr. Rutenber states that Fay Servicing would not accept a single payment. Mr. Seymour explained that he could not get a hold of Trecia Smith, the SPOC, and needs someone to allow him to make a payment on his Loan. Mr. Rutenber offered

FIRST AMENDED CLASS ACTION COMPLAINT

to place Plaintiffs' Loan into a pandemic forbearance plan and Mr. Seymour accepted the forbearance.

71.    Plaintiffs never received a written acknowledgement of the forbearance plan and were not made aware of the specific terms or duration of the same.

### *FAY SERVICING FALSELY CLAIMS THAT IS HAS BEEN COMPLETELY UNABLE TO MAKE CONTACT WITH PLAINTIFFS*

72.    On May 27, 2020, as a prerequisite to commencement of a foreclosure action and in an attempt to collect a debt, Fay Servicing sent Plaintiffs a letter dated May 27, 2020 which falsely stated that Fay Servicing "attempted to contact you by first class mail and on at least three occasions by phone to discuss and assess your financial situation and to explore options that may be available to you to avoid foreclosure.  Despite these attempts, we have been unable to contact you as of this date."  A true and correct copy is attached as "**Exhibit H**."  The May 27, 2020 letter specifically states that "Fay Servicing, LLC is a debt collector, this is an attempt to collect a debt and any information obtained will be used for that purpose."

73.    On June 6, 2020, David Seymour called Fay Servicing in an attempt to speak with the purported SPOC.  Rather than being connected with the SPOC, Mr. Seymour was connected with Bryce Conklin.  Mr. Conklin was not familiar with Plaintiffs' loan or their prior requests for mortgage assistance.   Mr. Seymour explained that Plaintiffs were in trouble with their mortgage, that they needed mortgage assistance and that they would like to make a payment on the Loan.  Mr. Conklin made no reference to any mortgage forbearance on Plaintiffs' account.  Mr. Conklin stated that Plaintiffs were "due for" March, April, May and June and then stated that he needed to transfer the call to an "account manager."  Mr. Seymour stated that he has never been able to speak with Trecia Smith, his account manager. Ms. Smith was not available and the call was purported transferred to the "next available account manager."

74.     On June 8, 2020, David Seymour called Fay Servicing in an attempt to speak with the purported SPOC, Trecia Smith.  Rather than being connected with the SPOC, Mr. Seymour was connected with Shanetta Bowen.  Ms. Bowen was not familiar with Plaintiffs' Loan or their prior requests for mortgage assistance.  Mr. Seymour explained that he has never been able to make contact with his SPOC, Ms. Smith, and that he would like to speak with her.  Ms. Bowen ignored this request and simple gathered the Loan information.  Mr. Seymour explained the entire situation over again to this new employee on Plaintiffs' Loan.

75.     On the June 8, 2020 call with Ms. Bowen, Ms. Bowen explained the document requirements for a loss mitigation application and stated that Plaintiffs would need to submit a profit & loss statement covering "one quarter" and that only business bank statements would be required.  Regarding Mrs. Seymour's social security income, Ms. Bowen stated that "we would need […] either her social security award letter, or if the funds are direct deposit into a bank account, she can send two months' worth of bank statements."

76.     On the June 8, 2020 call with Ms. Bowen, Mr. Seymour expressed serious concern about "jumping around" between various people at Fay Servicing and that he has never been able to speak to his single point of contact.  Ms. Bowen stated that Plaintiffs could "speak with any account manager if [the SPOC] is not available. We all assist each other. So if [your SPOC] is not available, then, you know, just speak with someone else."  Mr. Seymour further asked about the forbearance plan, but Ms. Bowen was unable to address any issue related to any purported forbearance on Plaintiffs' Loan.

77.     On June 16, 2020, David Seymour called Fay Servicing in an attempt to speak with the purported SPOC, Trecia Smith.  Rather than being connected with the SPOC, Mr. Seymour was connected with Megan Marshburn.  Ms. Marshburn was not familiar with Plaintiffs' Loan or his prior requests for mortgage assistance.  Mr. Seymour asked about speaking with Ms. Smith but was told she was unavailable.

*FAY SERVICING GIVES FALSE, ERRONEOUS AND CONFLICTING INFORMATION TO PLAINTIFFS CAUSING INCREASED EXPENSES*

78.    On June 25, 2020, David Seymour called Fay Servicing in an attempt to speak with the purported SPOC, Trecia Smith.  Rather than being connected with the SPOC, Mr. Seymour was connected with Jim Lawlor.  Mr. Lawlor was not familiar with Plaintiffs' Loan or his prior requests for mortgage assistance.  Mr. Seymour explained that he was working on his profit & loss statement for the last quarter for submission as part of his mortgage assistance request. Mr. Lawlor stated that Plaintiffs would need to submit a "year-to-date" profit & loss rather than just the last quarter.  This information is counter to what Mr. Seymour was told on his June 8, 2020 call with Ms. Bowen.  This incorrect and inconsistent information required Plaintiffs to pay for additional changes to the profit & loss statements to address the false information and cause a further delay in resolving Plaintiffs' mortgage default which increased the costs, fees, accrued interest and outstanding balance of the Loan.

79.    On the June 25, 2020 call with Mr. Lawlor, Mr. Lawlor also stated that Plaintiffs would be required to submit business tax returns as part of the loss mitigation application.   This information was incorrect and false and caused Plaintiffs to expends funds on a tax preparer which was unnecessary.  Mr. Lawlor also falsely stated that Plaintiffs would be required to submit both social security award letters and bank statements to prove Mrs. Seymour's social security income. Mr. Lawlor did not reference any forbearance associated with Plaintiffs' Loan.

80.    The false and inconsistent information provided by Mr. Lawlor delayed Plaintiffs' ability to properly submit a written loss mitigation request and forced Plaintiffs to incur costs and fees in adjusting their loss mitigation application.

81.    During the June 25, 2020 call with Mr. Lawlor, Mr. Seymour explained that the Covid-19 pandemic was affecting his ability to get all the documents submitted for his mortgage assistance request.  Mr. Seymour also explained that Mrs. Seymour was still suffering from her injuries and has significant health issues related

**FIRST AMENDED CLASS ACTION COMPLAINT**

to the stroke, diabetes and her seizures along with the serious car accident she suffered.

### PLAINTIFFS ARE PLACED INTO A COVID-19 FORBEARANCE PLAN UNDER 12 C.F.R. § 1024.41(c)(2)(v)(A).

82.   On July 31, 2020, Curtis Walker at Fay Servicing sent Plaintiffs a letter (the **"Forbearance Letter"**) acknowledging an "incomplete loss mitigation application" and placing Plaintiffs into a forbearance plan "due to a COVID-19 hardship." (the **"Forbearance Plan"**). A true and correct copy is attached as "**Exhibit I**."

83.   As stated in the Forbearance Letter, Plaintiffs "were approved for, and accepted, a Forbearance Plan based on an evaluation of an incomplete loss mitigation application" and that this forbearance was "in response to a recent request for loss mitigation assistance due to a COVID-19 hardship."   Pursuant to the Forbearance Letter, Servicer offered, and borrower accepted, the Forbearance Plan based upon Servicer's evaluation of an incomplete application as contemplated by 12 C.F.R. § 1024.41(c)(2)(v)(A).

84.   Further, the Forbearance Letter states, "Although you do not need to take any further action at this time, you are invited to complete your loss mitigation application to receive an evaluation for all available loss mitigation options." The letter continues, "[y]ou will have the opportunity to be evaluated for other options available at the conclusion of the forbearance period.  In addition, we will reach out to you at least 30 days prior to the end of the Forbearance Plan to discuss your situation and provide additional information regarding options that may be available to you."

85.   The Forbearance Letter does not indicate any expiration date for the Forbearance Plan.  Plaintiffs received no further information about the Forbearance Plan.  Specifically, Plaintiffs were not notified by Servicer in writing regarding the terms or duration of the Forbearance Plan and Plaintiffs have not received notice of

**FIRST AMENDED CLASS ACTION COMPLAINT**

any expiration of the Forbearance Plan.  Plaintiffs believe and understand that they are still in the Forbearance Plan at the time of this complaint.

86.     On July 31, 2020, David Seymour called Fay Servicing in an attempt to speak with the purported SPOC, Trecia Smith.  Rather than being connected with the SPOC, Mr. Seymour was connected with Kedrick Gray.  Mr. Gray was not familiar with Plaintiffs' Loan or their prior requests for mortgage assistance.  Mr. Seymour explained that he needed help with his loss mitigation application.  Rather than assist Mr. Seymour with the issues related to the loss mitigation application, Mr. Gray simply directed Mr. Seymour to the Fay Servicing website for more information.  Mr. Gray falsely stated that Plaintiffs were "late for" March, April, May June and July.  Mr. Gray did not reference any forbearance plan.

***FAY SERVICING DESIGNATES ANOTHER NEW ACCOUNT MANAGER***
***WHO CANNOT FIND ANY FORBEARANCE INFORMATION***

87.     On August 10, 2020, Curtis Walker from Fay Servicing called David Seymour.  Mr. Walker warned Mr. Seymour that "Fay Servicing is a debt collector and the information obtained will be used for that purpose."  Mr. Walker stated that he was Plaintiffs' new "account manager."  Mr. Walker was not familiar with Plaintiffs' Loan or their prior requests for mortgage assistance.   Mr. Seymour explained the entire situation over again to this new "account manager" on Plaintiffs' Loan.  When Mr. Seymour inquired about the forbearance plan, Mr. Walker stated "Um, I'm trying to figure out what's going on and why there- there's still not, the forbearance is not reflecting on the account."

88.     On August 13, 2020, an unknown person at Fay Servicing sent Plaintiffs a second ***Form Loss Mitigation Letter*** which stated that "Fay Servicing, LLC is a debt collector, and any information you provide to us will be used for the [sic] purpose."  This Form Loss Mitigation Letter also contained the same threat that a full and complete loss mitigation application "must be received at least seven (7) days before a scheduled foreclosure sale in order for a borrower to be eligible for loss

mitigation options." And that "[i]f a complete … loss litigation application is not received by the dates identified in this paragraph, you will not be eligible for any loss mitigation option and the foreclosure sale may proceed."  A true and correct copy is attached as "**Exhibit S**."  Again, this threat is in direct violation of the requirements under HBOR.

89.    On August 18, 2020, David Seymour called Fay Servicing in an attempt to speak with the purported SPOC, Curtis Walker.  Rather than being connected with the SPOC, Mr. Seymour was connected with Shanetta Bowen.  Mr. Seymour explained that he has been unable to make contact with his new "account manager," Mr. Walker.  Mr. Seymour wanted to make a payment on his Loan but Ms. Bowen stated that was not allowed.  Ms. Bowen stated that "at any point, the account can start foreclosure action" unless the full default is paid.  Plaintiffs are informed and believe and thereupon allege that this threat of foreclosure action was false and improper given the outstanding Forbearance Plan.

90.    On the August 18, 2020 call with Ms. Bowen, Mr. Seymour asked about the required year-to-date profit & loss statement and Ms. Bowen stated that the profit & loss statement only had to cover 3 months, and not year-to-date as Mr. Seymour was told on a previous call to Fay Servicing.  Ms. Bowen also confirmed that _either_ a social security award letter _or_ bank statements showing the SSA direct deposits would be needed for proof of social security income rather than _both_ as Mr. Seymour was told on a previous call to Fay Servicing.

91.    On September 1, 2020, David Seymour called Fay Servicing in an attempt to speak with the purported SPOC, Curtis Walker.  Rather than being connected with the SPOC, Mr. Seymour was connected with Carlos Castillo.  Mr. Castillo was not familiar with Plaintiffs' Loan or their prior requests for mortgage assistance.  Mr. Seymour explained that he has been unable to connect with his SPOC and that his account manager has changed multiple times.  Mr. Castillo stated "well, the person, I'm sorry, unfortunately accounts do change quite often with

account managers, but the person currently assigned is Mr. Curtis Walker." Mr. Seymour asked if Mr. Walker would be notified of the following:

> "uh, tell him I'm a little late because he knows my wife is very ill and we were trying to create a letter to show them all the illnesses she had. And, and, uh, she had, uh, uh, an MRI and it turned out just last week that she has a, uh, uh, a mass or a tumor on her lung so that's why I'm a little late. And I'm sure other people tell you all kinds of stories, but I have the proof of the doctor's visits and-and to the cancer center and everything. So, um, so that's why, because I – so anyway, and they know that, and she doesn't work right now when she used to. And so our, you know, mo – the amount of money we bring in has gone down. But – plus COVID[.]"

92. On September 11, 2020, David Seymour called Fay Servicing in an attempt to speak with the purported SPOC, Curtis Walker. Rather than being connected with the SPOC, Mr. Seymour was connected with Christine Mixon. Ms. Mixon was not familiar with Plaintiffs' Loan or their prior requests for mortgage assistance. Mr. Seymour explained that he has not been able to connect with his SPOC, Curtis Walker, and that Plaintiffs need help with the loss mitigation application. Ms. Mixon was unable to assist.

### *PLAINTIFFS SUBMIT A COMPLETE*
### *LOSS MITIGATION APPLICATION ON SEPTEMBER 14, 2020*

93. On September 14, 2020, Plaintiffs submitted a full and complete loss mitigation application on the Servicer's required forms and including the following information which was requested on the multiple phone calls with Fay Servicing employees:

a. Signed and dated Fay Servicing Borrower Assistance Form.

b. Hardship explanation including the financial and medical difficulties experienced by Plaintiffs which led to default and necessitated the need for loss mitigation.

c. Profit & Loss financial statement for Mr. Seymour's contracting business which covered January 2020 to July 2020.

**FIRST AMENDED CLASS ACTION COMPLAINT**

d.  Profit & Loss financial statement for Mr. Seymour's contracting business for May 2020.

e.  Profit & Loss financial statement for Mr. Seymour's contracting business for June 2020.

f.  Profit & Loss financial statement for Mr. Seymour's contracting business for July 2020.

g.  Copies of February, March and April rent income checks.

h.  Montecito Bank & Trust – Checking Account Statement: account # 2332, David Seymour/Dave Seymour Construction (ending June 30, 2020).

i.  Montecito Bank & Trust – Checking Account Statement: account # 2332, David Seymour/Dave Seymour Construction (ending July 31, 2020).

j.  Montecito Bank & Trust – Savings Account Statement: account # 2079, David Seymour/Dave Seymour Construction (ending June 30, 2020).

k.  Montecito Bank & Trust – Savings Account Statement: account # 2079, David Seymour/Dave Seymour Construction (ending July 31, 2020).

l.  Montecito Bank & Trust – Checking Account Statement: account # 8024, David Seymour/Elle Seymour (ending June 26, 2020).

m. Montecito Bank & Trust – Checking Account Statement: account # 8024, David Seymour/Elle Seymour (ending July 28, 2020).

n.  Montecito Bank & Trust – Star Checking Account Statement: account # 9191, Elle Seymour (ending July 3, 2020).

o.  Montecito Bank & Trust – Star Checking Account Statement: account # 9191, Elle Seymour (ending Aug 3, 2020).

**FIRST AMENDED CLASS ACTION COMPLAINT**

p. Union Bank – Checking Account Statement: account # 1173, David Seymour/Elle Seymour (ending July 28, 2020).

q. Union Bank – Checking Account Statement: account # 1173, David Seymour/Elle Seymour (ending Aug 26, 2020).

A true and correct copy of the September 14, 2020 loss mitigation application is attached as "**Exhibit J**."

94.    Plaintiffs' September 14, 2020 loss mitigation application constituted a "complete application for a first lien loan modification" as that phrase is used in HBOR and a "complete loss mitigation application" as used under RESPA, 12 C.F.R. § 1024.41(g).

### FAY SERVICING GIVES FALSE AND ERRONEOUS INFORMATION ABOUT PLAINTIFFS' LOSS MITIGATION APPLICATION AND REQUESTS UNREQUIRED AND DUPLICATIVE INFORMATION

95.    On September 16, 2020, David Seymour called Fay Servicing in an attempt to speak with the purported SPOC, Curtis Walker, regarding Plaintiffs' loss mitigation application.  Rather than being connected with the SPOC, Mr. Seymour was connected with Tom Adler.  Mr. Adler was not familiar with Plaintiffs' Loan or their prior requests for mortgage assistance.  Mr. Adler falsely claimed that the social security income was not shown in the loss mitigation application.  However, Mr. Seymour identified the income which was included on the submitted bank statements showing the direct deposits on June 24, 2020 and July 22, 2020, identified as "SSA" in the exact amounts noted on the loss mitigation application. Mr. Adler eventually admitted that he was not qualified to assist Mr. Seymour, and stated:

"Yeah. The-the thing is I'm not on, I'm not on the assistance team, so I don't handle, you know, these things. That's my best advice to you would be to – just to get it done even if it's rep – even if it's repeti – even if it's repetitive, uh, just send these documents and that'll make sure you get a complete and in for review. Even if you think you've already done it before, it's just I've – you know, instead of, I don't have

a printer and I can't scan stuff and send it back to the assistance team. So just send it again."

96.   On the September 16, 2020 call, Mr. Adler falsely and wrongfully claimed that two previously unstated requirements needed to be met by Plaintiffs:

> a. First, Mr. Adler claimed that Plaintiffs' profit & loss statements would need to be signed; and
>
> b. Second, Mr. Adler claimed that check images are required to be included for all bank statements.

97.   Regarding these two previously unrequested items, Plaintiffs were never told to sign the profit & loss statements despite having spoken with at least two employees on three separate calls about the *specific requirements* for the profit & loss statements and those two employees disagreed with whether quarterly or year-to-date financials were required (Plaintiffs submitted and paid for BOTH). Further, Plaintiffs were told that check images would *not* be required as part of the bank statements.

98.   Plaintiffs submitted their loss mitigation request on a completed Fay Servicing "Borrower Assistance Form" which was signed by both Plaintiffs and pursuant to which Plaintiffs were required to "certify, acknowledge, and agree" that all the submitted information was truthful and that "knowingly submitting false information may violate federal and other applicable law." This signed certification renders any signature on a profit & loss statement redundant and unnecessary. Further, there is no requirement in the Fay Servicing "Borrower Assistance Form" to provide a signature on the profit & loss statements.

99.   Examining the Fay Servicing website which addresses borrowers who are "having difficulty making payments" at https://www.fayservicing.com/having-difficulty-making-payments/, a borrower will see the following:

> The documents required for loss mitigation may vary depending on the owner of your loan. Your Account Manager will be able to provide you with the documents needed for your loss mitigation review, however if

**FIRST AMENDED CLASS ACTION COMPLAINT**

you are unable to speak with your Account Manager you may submit the applicable documents listed on the Document Checklist.

Borrower Assistance Form

Documentation Checklist

Tax Information Request Form

3rd Party Authorization Form (if applicable)

100.   Clicking on "documentation checklist" brings a borrower to this page: https://www.fayservicing.com/wp-content/uploads/Document_Checklist_Final_for_Reduced_Doc_3-27-19.pdf, which, if clicked, lands a borrower at the following: "The page can't be found." Borrowers must rely upon their "account manager," which Plaintiffs did, in submitted the required documents for a loss mitigation request.

101.   On the September 16, 2020 call with Mr. Adler, Mr. Seymour was directed to expend time, energy and money in resubmitting all of his documents even if those documents were already submitted and to submit previously unrequested information in an attempt by Fay Servicing to wrongfully delay Plaintiffs' loss mitigation review, increasing the default amount and making a loan modification impossible.

102.   On September 16, 2020, Curtis Walker, on behalf of Servicer, sent Plaintiffs a letter acknowledging receipt of the loss mitigation documents but falsely claiming that certain items were missing which were actually submitted by Plaintiffs. A true and correct copy is attached as "**Exhibit K**."

103.   The September 16, 2020 letter identifies the following items as being missing and required to "complete the Loss Mitigation Application":

a.   "David Seymour: Please provide last year's full tax returns (business and personal) or the most recent signed and dated quarterly or year-to-date profit and loss statement AND the last 2 months' bank statements (business and personal)."

b. "Elle Seymour: Please return the two most recent bank statements showing deposit amounts or award letter or other documentation showing the amount and frequency of benefits. Please return the two most recent bank statements showing receipt of income or other documentation showing the amount and frequency of the income."

104. On September 22, 2020, Servicer sent another letter to Plaintiffs' requesting the identical information as the September 16, 2020 letter.

105. Plaintiffs had already submitted the profit and loss statement and bank statements. Further, Plaintiffs had already submitted evidence of Elle Seymour's social security deposits. These items were erroneously listed in the incomplete application letters. Fay Servicing's September 16, 2020 and September 22, 2020 "incomplete application" letters are false and fraudulent and evidences a pattern and practice of Fay Servicing wrongfully delaying loss mitigation reviews in order to increase its profits by charging fees during the default servicing process.

106. Fay Servicing repeatedly failed to acknowledge the listed documents as required by state and federal law which had been previously submitted by Plaintiffs and used its false response letters to repeatedly delay Plaintiffs' loss mitigation review and increase Plaintiffs' default amount making it impossible for Plaintiffs to secure a loan modification.

107. Fay Servicing also played a shell game with the single point of contact and various "account managers" so that Plaintiffs would not be able to speak with a knowledgeable person to clarify Fay Servicing's repeated errors which further delayed the loss mitigation review and increased the default amount which could have been resolved and avoided with a timely review of Plaintiffs' Application.

108. On October 14, 2020, David Seymour called Fay Servicing in an attempt to speak with the purported SPOC, Curtis Walker, regarding Plaintiffs' loss mitigation application. Rather than being connected with the SPOC, Mr. Seymour was connected with Bryce Conklin. Mr. Conklin was not familiar with Plaintiffs'

Loan or their loss mitigation application. When asked if Fay Servicing had received everything required for Plaintiffs' loss mitigation application, Mr. Conklin was confused and stated that he was reading the notes in the file as was trying to determine "if it's an old note or an up-to-date note." Mr. Conklin said he would try to "message [Plaintiffs'] account manager. See if he's in. Maybe he can help. Its Curtis Walker. [pause] No, he's not in the office today." Mr. Conklin was unable to assist Mr. Seymour in assuring that Plaintiffs' loss mitigation application was complete.

109. On October 15, 2020, David Seymour called Fay Servicing in an attempt to speak with the purported SPOC, Curtis Walker, regarding Plaintiffs' loss mitigation application. Rather than being connected with the SPOC, Mr. Seymour was again connected with Bryce Conklin. Mr. Seymour stated that he has been trying to contact the SPOC, Curtis Walker, but has not been able to connect with him. Mr. Conklin tried to connect the call with the SPOC, Mr. Walker, but failed.

110. In response to Fay Servicing's failure to review Plaintiffs' loss mitigation application and false requests for additional documents and information, and in accordance with Tom Adler's instructions, that "even if it's repetitive, uh, just send these documents […][e]ven if you think you've already done it before, […] just send it again," Plaintiffs submitted the following information and documentation on or before October 15, 2020:

>  a. Mrs. Seymour's Checking Account Statement (account # 9191, Ending July 3, 2020) with the Social Security deposits and income specifically circled, highlighted and marked with an asterisk "showing the amount and frequency of the benefits" as specifically requested in Servicer's September 16 and 22 letters.

>  b. Mrs. Seymour's Checking Account Statement (account # 9191, Ending Aug 3, 2020) with the Social Security deposits and three additional incomes deposits specifically circled, highlighted and

**FIRST AMENDED CLASS ACTION COMPLAINT**

marked with an asterisk "showing the amount and frequency of the benefits" along with the "amount and frequency of income" as specifically requested in Servicer's September 16 and 22 letters.

c. Mr. Seymour's Checking Account Statement (account # 2332, David Seymour/Dave Seymour Construction (ending June 30, 2020).

d. Montecito Bank & Trust – Checking Account Statement:  account # 2332, David Seymour/Dave Seymour Construction (ending July 31, 2020).

e. Montecito Bank & Trust – Checking Account Statement: account # 2332, David Seymour/Dave Seymour Construction (ending Aug 31, 2020).

f. Montecito Bank & Trust – Checking Account Statement: account # 2332, David Seymour/Dave Seymour Construction (ending Sept 30, 2020).

g. Montecito Bank & Trust – Savings Account Statement: account # 2079, David Seymour/Dave Seymour Construction (ending Aug 31, 2020).

h. Montecito Bank & Trust – Savings Account Statement: account # 2079, David Seymour/Dave Seymour Construction (ending Sept 30, 2020).

i. Montecito Bank & Trust – Checking Account Statement: account # 8024, David Seymour/Elle Seymour (ending Aug 28, 2020).

j. Montecito Bank & Trust – Checking Account Statement: account # 8024, David Seymour/Elle Seymour (ending Sept 28, 2020).

k. A signed and dated Profit & Loss Statement covering January 2020 to August 2020.

l. A written statement, as required, explaining that pages 2 and 4 from Mrs. Seymour's banks statements were devoid of any financial or

**FIRST AMENDED CLASS ACTION COMPLAINT**

material information whatsoever.   Page 2 being canned bank disclosures regarding 'consumer rights,' 'questions about electronic transfers' and a blank sample check register with instructions on how to balance a bank account. Page 4 containing, in total, the following words: "Register for online banking by going to https://montecito.bank" The written statement directs Servicer to account number 2332 for an identical set of pages to show the contents explained above.

A true and correct copy of these submissions are attached as "**Exhibit L**."

111.   As of October 15, 2020, any alleged deficiencies in Plaintiffs' September 14, 2020 loss mitigation application were cured.   The Servicer has absolutely everything requested from Plaintiffs and the loss mitigation application was complete.   Servicer's legal obligations require a final answer on Plaintiffs' loss mitigation application on or before November 15, 2020 ("***Loss Mitigation Response Date***") so that Plaintiffs could either accept terms of a modification or seek other loss mitigation options or other means of protecting their home from further foreclosure activity.

112.   As of October 15, 2020, A foreclosure sale had not been scheduled for the Property. Accordingly, Servicer received the Plaintiffs' loss mitigation application more than 90 days before any foreclosure sale date.

### *ONGOING DUAL TRACKING BY FAY SERVICING WHILE PLAINTIFFS' LOSS MITIGATION APPLICATION WAS OUTSTANDING AND UNREVIEWED*

113.   Unbeknownst to Plaintiffs, during the loss mitigation process above, Servicer, Lender and Trustee were preparing the following documents and filings related to the foreclosure of Plaintiffs' Property:

a. On September 29, 2020, Damitira Anderson, Assistant Secretary at the Servicer, signed a substitution of trustee (the ***Substitution of***

**FIRST AMENDED CLASS ACTION COMPLAINT**

*Trustee"*) which substituted the foreclosure trustee so that Servicer could press forward with foreclosure. A true and correct copy is attached as "**Exhibit M**."

b. On October 9, 2020, Ryan Finnigan, VP, Fay Servicing, LLC, signed a formal declaration of compliance with Cal. Civ. Code § 2923.55 indicating that the mortgage servicer contacted the borrower to assess the borrower's financial situation and to explore options for the borrower to avoid foreclosure, and that thirty days had passed since the initial contact. A true and correct copy of is attached as "**Exhibit N**."

c. On October 13, 2020, Servicer recorded the Substitution of Trustee in the Official Records as document number 2020-0056476. (See **Exhibit M**).

d. On October 16, 2020, DeeAnn Gregory, as "Authorized Signatory" as Servicer's foreclosure trustee signed the official *Notice of Default and Election to Sell Under Deed of Trust*. A true and correct copy of is attached as "**Exhibit O**."

114. Servicer's actions listed above occurred after Servicer had a facially complete loss mitigation application from Plaintiffs and said actions continued throughout the loss mitigation process indicating a knowing and willful dual tracking of Plaintiffs' foreclosure.

115. On October 16, 2020, David Seymour called Fay Servicing in an attempt to speak with the purported SPOC, Curtis Walker, regarding Plaintiffs' loss mitigation application. Rather than being connected with the SPOC, Mr. Seymour was connected with Mary Cabello. Ms. Cabello was not familiar with Plaintiffs' Loan or their loss mitigation application and transferred the file to another employee, James Palikan.

*FAY SERVICING ADMITS THAT IT DOES NOT COMPLY WITH*
*ANY "SINGLE POINT OF CONTACT" REQUIREMENTS*

116.   On October 16, 2020, David Seymour was transferred to James Palikan instead of his SPOC, Curtis Walker.   Mr. Palikan was not familiar with Plaintiffs' Loan or their loss mitigation application.   When asked about the SPOC, Mr. Palikan stated "[u]h, Curtis Walker, I do know the gentleman [...] I do know he handles an exorbitant amount of inbound loans right now. So he's – I hate to say it, we're, you know, we are being a little overworked, just like everybody else is out there during this pandemic period. And you can imagine our job actually gets – it got busier as the economy gets worse. So yeah."

117.   On the October 16, 2020 call with Mr. Paliken, Mr. Seymour stated that he has only been able to speak to his SPOC, Curtis Walker, on one occasion.   In response to this concern about the unavailability of the SPOC, Mr. Palikan stated:

> "[A]ny account manager here can help review you and help you with that. So you – you're doing okay. Uh, I do see some documents were received here. Uh, they are being reviewed right now by our applications department. Uh, it's – so we can get this package marked as complete, which will allow us to place your foreclosure on hold for 30 days while we get you reviewed for all the different retention programs that we're trying to-to help people out with. So, um, y – y – I mean, I've, uh, you know, you usually need a day or two for them to go through everything individually and then update it in the system."

118.   Mr. Seymour then restated his concerned about the unavailability of the SPOC, Curtis Walker, by stating:

> What I was panicked with is that – I mean, think about it. I have this account manager that I can't get, so I get somebody different every time. And I have to say, uh, Bryce was really good and I was able to get them back. I mean, when I couldn't get Curtis, I just – Bryce had given me his direct line and he-he would, you know, call me or ca – or I'd got him. And then today, after I sent stuff and I didn't – he said there would be – it would yo – it

would show up on your computer, but it didn't. So then my fear was you didn't get anything, see."

119.   On the October 16, 2020 call with Mr. Palikan, Mr. Seymour expressed concern that he's not received confirmation of his complete application and that his deadline was that same day.  In response, Mr. Palikan stated: "Well, we can give you a little extra time. That's not a problem. […] we should be okay."   When Mr. Seymour restated his concern regarding the October 16, 2020 deadline for document submissions and the lack of a response from his SPOC on the items previously provided, Mr. Palikan stated:

> Yeah. What we do, we have to set certain type of deadlines, but we give everybody a little bit of grace there when it comes to those income documents. And again, sometimes, you know, it's basically because, you know, if we're asking for paycheck, stubs or bank statements, you know, if you fall off that, and then we have to ask for a whole nother one and it just kind of – you know, just it lengthens the process. So –

### FAY SERVICING VERBALLY CONFIRMS RECEIPT OF PLAINTIFFS' COMPLETE LOSS MITIGATION APPLICATION

120.   On the October 16, 2020 call, Mr. Palikan confirmed "you've done everything right here because I'm kind of looking through the documents, uh, business and personal bank statements, one more are all updated, all pages. The rental income information is here.  The assistance package is here.  Again, all your benefit income was here. We just needed a – basically to confirm that for your wife in-in – in the, in the bank statements. So it looks like you sent everything over. Just – I would say give it another two or three days. Let the guys review all the material you sent and then maybe follow up on a – I'd say follow up maybe Tuesday. Okay."

### SERVICER AND TRUSTEE KNOWINGLY RECORD AN ILLEGAL NOTICE OF DEFAULT

121.   On October 20, 2020, while Plaintiffs' full and complete loss mitigation application was outstanding and under review (*and while Plaintiffs were in an*

*approved RESPA Covid-19 Forbearance Plan*), Servicer and Trustee illegally recorded a *Notice of Default and Election to Sell under Deed of Trust* (the ***"NOD"***) in the Official Records as document number 2020-0058741. (See **Exhibit O**.)

122. Plaintiffs are informed and believe and thereupon allege that First American lacked reasonable grounds for its belief that First American could legally record the NOD without violating RESPA and HBOR, and, by recording the NOD, First American acted in reckless disregard of Plaintiffs' rights under RESPA and HBOR. As alleged further below, First American later rescinded the NOD, tacitly admitting that the recording of the same violated RESPA and HBOR as alleged herein.

123. RESPA and HBOR added extensive and specific obligations and limitations on First American's actions under California's statutory foreclosure process which First American systematically and recklessly disregards. Plaintiffs are informed and believe and thereupon allege that First American wrongfully delegates its responsibilities under RESPA, HBOR and California's foreclosures statutes to various mortgage servicers and then buries its head under the *limited* privilege found in Civ. Code § 2924. However, RESPA and HBOR make it clear that recording the NOD under the circumstances alleged herein is a violation of state and federal law. Plaintiffs are informed and believe and thereupon allege that First American undertook these actions without even the slightest evidence that recording the NOD was allowed under state and federal law.

124. Plaintiffs are informed and believe and thereupon allege that First American does little more than take orders from mortgage servicers and recklessly disregards Plaintiffs' and class members' rights under RESPA and HBOR in favor of maintaining its relationship with First American's repeat customers, the mortgage servicers. First American is required to act as a common agent for both the beneficiary and the trustor/homeowner under the Deed of Trust and state foreclosure laws, yet First American actually acts under the sole direction of the mortgage

servicers, like Fay Servicing.  First American has a financial incentive to ignore state and federal law while completing its statutory duties which expedites the foreclosure process as those actions directly benefit mortgage servicers, which are the parties who select the foreclosure trustee on those servicers' hundreds of thousands of mortgage loans which require foreclosure action in California and across the Country.  However, the scope and nature of the First American's duties are defined and limited by the governing foreclosure statutes under the restriction set forth in RESPA and HBOR, both of which directly prohibited First American from recording a NOD under the circumstances alleged herein.

125.  Plaintiffs allege that First American had no information regarding the status of Plaintiffs' rights under RESPA and HBOR and that First American purposefully failed to inquire regarding those rights despite over a decade of experience with wrongful foreclosure lawsuits under RESPA and HBOR which indicate significant harm to the borrowers in situations where RESPA and HBOR have been violated.

126.  Plaintiffs are informed and believe and thereupon allege that First American fails to make inquiry into Plaintiffs' RESPA and HBOR rights in order to remain purposefully ignorant of those rights in order to claim the limited privilege under § 2924.  However, in comparison, First American does not take this approach when dealing with the automatic stay in bankruptcy which is akin to the prohibition on foreclosure found in RESPA and HBOR.  Rather than burying its head regarding the automatic stay, First American directly checks and verifies the status of any bankruptcy case to ensure that recording a notice of default does not violate the automatic stay.  However, when it comes to RESPA and HBOR, First American actively ignores and avoids inquiry which amounts to a reckless disregard of Plaintiffs' rights under RESPA and HBOR.

127.   Further, First American also purposefully failed to determine the status of any loan forbearance which would prohibit the recording of any Notice of Default as is the case here.

128.   First American's actions in violation of RESPA and HBOR, which include recording the NOD, were not in good faith as First American took no action to ensure it had any knowledge with respect to Plaintiffs' rights thereunder.  First American also acted with malice which is demonstrated through First American's improper conduct alleged above amounting to a reckless or wanton disregard for the truth, which evidences a willful disregard for and/or avoidance of accuracy as alleged above.

129.   On October 20, 2020, Servicer charged Plaintiffs $1,020.00 for foreclosure attorney fees related to the illegal foreclosure filing.

130.   On October 28, 2020, Servicer delivered a late acknowledgement that Plaintiffs' loss mitigation application was complete. A true and correct copy of is attached as "**Exhibit P**."

131.   On November 10, 2020, Servicer charged Plaintiffs $238.71 in "foreclosure fees & costs" related to the illegal foreclosure filing.

### *FAY SERVICING AGAIN ADMITS THAT IT DOES NOT COMPLY WITH ANY "SINGLE POINT OF CONTACT" REQUIREMENTS*

132.   On November 16, 2020, David Seymour called Fay Servicing in an attempt to speak with the purported SPOC, Curtis Walker, regarding Plaintiffs' loss mitigation application.  Rather than being connected with the SPOC, Mr. Seymour was connected with Luke Visconti.  Mr. Visconti was not familiar with Plaintiffs' Loan or their loss mitigation application.   Mr. Visconti tried to connect the call with Mr. Walker but was unable to locate him. Mr. Seymour asked Mr. Visconti where he was located, and the following exchange ensued:

Dave Seymour:     So w – where am I calling? What state?

**FIRST AMENDED CLASS ACTION COMPLAINT**

| | | |
|---|---|---|
| Luke Visconti: | What? Okay. Before I answer that one, I have a problem, but why do you ask? I'm just curious. | |
| Dave Seymour: | Oh, I just wonder where I'm calling. Sometimes I call and I get Chicago. Sometimes I get Texas. | |
| Luke Visconti: | No, I know. Understood. But I mean, how does it, I mean, I'm wondering why that matters. | |
| Dave Seymour: | I-I-I just, I just wonder, | |
| Luke Visconti: | Okay. | |
| Dave Seymour: | I'm curious because I-I called so many times. | |
| Luke Visconti: | David, I know there's a reason. I know there's a reason. I don't know what it is. Okay. But you're calling into Chicago. | |
| Dave Seymour: | Okay. Okay. All right. All right. I know I sent my loss mitigation, I think to Chicago. See, so, uh, so I just wonder, and then I think my, uh, Curtis Walker is in Texas. I don't know. | |
| Luke Visconti: | He is. So we, so we have places all over the country, right? Predominantly Chicago. | |
| Dave Seymour: | Yeah, I know. | |
| Luke Visconti: | And then, but we have Fay – but we have loss mitigation, we have those folks in-in-in-in a couple of different places, same thing with account managers. We have them in Tempe – or not Tempe, but, uh, Phoenix, we have them in Tampa. We have them in Texas. We have them in Chicago. Right? So different departments will be in different-different states. | |
| Dave Seymour: | Okay, I guess. Yeah. That's all. Okay. I'm under duress, I'm trying to get this thing done. And-and I have, I did get a letter finally that said the thing that I did was fine. I finally, it took four tries to get everything that they wanted. Uh, and-and, but I've just, you know, they assigned me Curtis Walker. I talked to him twice and I've never been able to talk to him again. | |

42

**FIRST AMENDED CLASS ACTION COMPLAINT**

| | | |
|---|---|---|
| Luke Visconti: | Yeah. | |
| Dave Seymour: | And so I just, like, well – | |
| Luke Visconti: | Just keep, just keep calling the other number. Right. So forget individual, because let me tell you something, since COVID hit, we can't give people the personalized attention that we – that we were able to give in the past. We went from 1,000 calls in a day to 3,000. | |
| Luke Visconti: | We got 75 account managers when the, when the calls were a thousand. Now we have 65 account managers at 3,000 calls a day. So I can tell you, we're more busy taking inbounds and we don't, unfortunately, we don't have the luxury of calling back or making these outbound phone calls as much as we want. So that's just, you know, since COVID. | |
| Dave Seymour: | Yeah. And everybody said that, we-we will e – I mean, mailing them right away. And then, you know, I would get a letter from them back that this is what I need, you know, or whatever. So it's just, you know, when they said that I would have one guy, when I was with Wells Fargo, I had one guy. And then, it's, you know – | |
| Luke Visconti: | Right. Like I said, all – I know what you mean. All heck broke loose with COVID. All bets were off. | |
| Dave Seymour: | Yeah. Yeah. So you feel like you're bounced all over. So I get – | |
| Luke Visconti: | That's why. | |

133.   On the November 16, 2020 call, Mr. Visconti confirmed that Fay Service has completely disregarded the SPOC requirement and that borrowers are subject to speaking with anyone of 65 account managers or countless employees that are not "account managers" who just happen to pick of the phone.  Mr. Visconti explained how borrower inquiries are handled at Fay Servicing: "Yeah. It's whoever picks up the phone. So here's-here's what I know."  In discussing these other Fay Servicing employees that handle loss mitigation calls, Mr. Visconti stated:

43
**FIRST AMENDED CLASS ACTION COMPLAINT**

"Some guys, some people are better. Some people are, some-some folks are a little bit more seasoned than others, David. Sometimes you're talking to the ones that are a little newer in the game. I've-I've got seven years. I know a lot more than they do. So-so, forgive them, okay. Sometimes they just don't know enough. And then they, and then when you give them push back, then they give you li – then they give you some sass on top of it so."

134. On November 16, 2020, past the expiration of the Loss Mitigation Response Date, Servicer sent Plaintiffs a letter (the ***"Loss Mitigation Denial Letter"***) stating that Plaintiffs were "not eligible for an alternative to foreclosure. Our review indicated that, although you may have a hardship, you do not qualify for any available loss mitigation options." A true and correct copy of is attached as "**Exhibit Q**."

135. The Loss Mitigation Denial Letter contains no specific explanation regarding why Plaintiffs are not eligible for any alternative to foreclosure or why Plaintiffs' do not qualify for any available loss mitigation options and the letter fails to provide enough information to allow for an effective appeal of the purported denial.

136. Despite being in an approved RESPA Covid-19 Forbearance Plan, the Loss Mitigation Denial Letter demands Plaintiffs pay $42,492.03 "as quickly as possible" to avoid the "negative impacts to your credit rating resulting from late payments and to avoid foreclosure" and warns that "Fay Servicing, LLC is a debt collector, and information you provide to us will be used for that purpose."

137. On January 22, 2021, David Seymour called Fay Servicing in an attempt to speak with the purported SPOC, Curtis Walker, regarding Plaintiffs' loss mitigation application. Rather than being connected with the SPOC, Mr. Seymour was connected with Kyle Williams. Mr. Williams was not familiar with Plaintiffs' Loan or their loss mitigation application. Mr. Seymour explained that Plaintiffs

needed a loan modification to keep their family home and wanted to discuss home retention options.  In response, Mr. Williams suggested Plaintiffs sell their home:

| K. Williams: | Um, you can also, you know, to avoid it going to foreclosure you, if you're not able to reinstate the loan, the other option is, um, you know, looking into selling the property to take advantage of any equity that's there too. |

| Dave Seymour: | I didn't want to move because it's like, you know, where do we go? Type of thing, but – |

| K. Williams: | Yeah, no, I-I get that. But the other side of it is if, you know, if it does get to foreclosure sale, then you obviously lose that equity and, um, you know, nobody wants to see that happen. So that's why we need to, you know, try to come up with a solution, you know, sooner rather than later. |

| K. Williams: | And then if you decide that you want to sell the property, uh, we do have a, um, uh, a network of realtors in your area that we can also, um, connect you with if you decide to go that route. |

## LITIGATION IS COMMENCED AND DEFENDANTS RESCIND THE ILLEGAL NOTICE OF DEFAULT

138.   On January 12, 2021, Plaintiffs commenced the present action and alleged, among other things, that the Notice of Default was recorded in violation of state and federal law and was rendered void.  Plaintiffs alleged the Notice of Default was invalid, unlawful and must be cancelled and fully rescinded from Plaintiffs' Property.

139.   On March 5, 2021, in response to the present legal action, Defendants rescinded the Notice of Default from Plaintiffs' Property.  A true and correct copy of is attached as "**Exhibit R**." However, Defendants have failed to cure and correct the resulting violations of state and federal law.  Further, it appears that Fay Servicing actually charged Plaintiffs $152 for having removed the illegal Notice of Default.

140.   By engaging in the conduct herein alleged, Defendants knowingly violated various state and federals laws including, without limitation, REPSA, HBOR, and the FDCPA.  Defendants' violations resulted in Plaintiffs forgoing, or being prevented from seeking, other available home retention options such as refinance, bankruptcy or curing the default.

## CLASS ACTION ALLEGATIONS

141.   Plaintiffs bring the first and fourth counts as a class action pursuant to Federal Rule of Civil Procedure 23, on behalf of themselves and the following persons who make up the "**Nationwide Servicer Class**" which is defined as all homeowners in the United States that submitted a loss mitigation application to Servicer within the last three years from the date the Complaint was filed in this action.

142.   Plaintiffs bring the fifth count as a class action pursuant to Federal Rule of Civil Procedure 23, on behalf of themselves and the following persons who make up the "**Nationwide Trustee Class**" which is defined as all homeowners in the United States that were subject to a foreclosure filing by Trustee while a complete loss mitigation application was pending.")

143.   Plaintiffs bring the second, fourth, sixth, eighth and ninth counts as a class action pursuant to Federal Rule of Civil Procedure 23, on behalf of themselves and the following persons who make up the "**California Servicer Subclass**" which is defined as all homeowners in the State of California that submitted a loss mitigation application to Servicer within the last four years from the date the Complaint was filed in this action.

144.   Plaintiffs bring the third, seventh and ninth counts as a class action pursuant to Federal Rule of Civil Procedure 23, on behalf of themselves and the following persons who make up the "**California Trustee Subclass**" which is defined as all homeowners in the State of California that were subject to a foreclosure filing

by Trustee while a complete loss mitigation application was pending within the last four years from the date the Complaint was filed in this action.

145.   Subject to additional information obtained through further investigation and discovery, the foregoing Classes may be expanded or narrowed by amendment at the time of class certification or via amended complaint.  Specifically excluded from the Classes is any entity in which Defendant had a controlling interest or which has a controlling interest in Defendant, and Defendant's legal representatives, assigns, and successors.

146.   Members of the Classes are so numerous that joinder is impracticable. While the exact number of class members is unknown to Plaintiffs, it is believed that the Classes are comprised of at least thousands of members geographically dispersed throughout the United States and the State of California. The Classes, however, are readily identifiable from information and records in the possession of Servicer.

147.   Common questions of law and fact exist as to all members of the Classes. These questions predominate over questions that may affect only individual class members because Defendants have acted on grounds generally applicable to the Classes. Such common legal or factual questions include:

      a.   Whether Servicer violated RESPA;

      b.   Whether Servicer engaged in a pattern or practice of violating RESPA;

      c.   Whether Plaintiffs and members of the Classes were damaged as a result of Servicer's violations of RESPA;

      d.   Whether Plaintiffs and members of the Classes are entitled to penalties and/or statutory damages as a result of Servicer's violations of RESPA

      e.   Whether Defendants violated 15 U.S.C. § 1692e

      f.   Whether Defendants engaged in a pattern or practice of violating 15 U.S.C. § 1692e;

g.  Whether Plaintiffs and members of the Classes were damaged as a result of Defendants' violations of 15 U.S.C. § 1692e;

h.  Whether Plaintiffs and members of the Classes are entitled to penalties and/or statutory damages as a result of Defendants' violations of 15 U.S.C. § 1692e;

i.  Whether Defendants violated 15 U.S.C. § 1692f

j.  Whether Defendants engaged in a pattern or practice of violating 15 U.S.C. § 1692f;

k.  Whether Plaintiffs and members of the Classes were damaged as a result of Defendants' violations of 15 U.S.C. § 1692f;

l.  Whether Plaintiffs and members of the Classes are entitled to penalties and/or statutory damages as a result of Defendants' violations of 15 U.S.C. § 1692f;

m. Whether Defendants violated California's Homeowner Bill of Rights;

n.  Whether Plaintiffs and members of the Classes were damaged as a result of Defendants' violations of California's Homeowner Bill of Rights;

o.  Whether Plaintiffs and members of the Classes are entitled to injunctive and/or declaratory relief; and

p.  Whether Servicer is required to modify Plaintiffs' and the Class members' mortgages.

148.  Defendants' defenses to Plaintiffs' claims are typical of its defenses to claims of the members of the Classes.

149.  Plaintiffs' claims are typical of the members of the Classes as all members of the Classes are similarly affected by Defendants' actionable conduct. Plaintiffs and all members of the Classes requested loss mitigation assistance and/or submitted loss mitigation applications to Servicer.  In addition, Defendants' conduct

that gave rise to the claims of Plaintiffs and members of the Classes (i.e., violating Regulation X, HBOR and the FDCPA) is the same for all members of the Classes.

150.   Plaintiffs will fairly and adequately protect the interests of the Classes because Plaintiffs have no interests antagonistic to, or in conflict with, the Classes that Plaintiffs seek to represent.   Furthermore, Plaintiffs have retained counsel experienced and competent in the prosecution of complex class action litigation. Plaintiffs have or can acquire adequate financial resources to assure that the interests of the Classes will not be harmed.

151.   Class action treatment is a superior method for the fair and efficient adjudication of this controversy in that, among other things, such treatment will permit a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, expense, or the possibility of inconsistent or contradictory judgments that numerous individual actions would engender.   The benefits of the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

152.   Plaintiffs know of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

153.   Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole.

154.   This forum is an appropriate forum for litigation of the claims of the Classes.

**FIRST AMENDED CLASS ACTION COMPLAINT**

**FIRST CAUSE OF ACTION**

**VIOLATIONS OF REGULATION X OF RESPA**

**(SERVICER)**

*(By Plaintiffs, on Behalf of the proposed Nationwide Servicer Class Against Defendant Servicer, including DOES 1-3 & 7-10)*

155.  Plaintiffs reallege and incorporate by reference all previous paragraphs and allegations above as though fully set forth herein.

156.  Servicer is a master servicer (a mortgage loan servicer) within the meaning of 12 C.F.R. § 1024.31.

157.  Plaintiffs and class members are borrowers of federally-related mortgage loans within the meaning of 12 C.F.R. § 1024.31.

158.  Plaintiffs and class members requested loss mitigation assistance from Servicer and submitted loss mitigation applications within the meaning of 12 C.F.R. § 1024.31.

159.  By virtue of the acts described above, Servicer engaged in a pattern and practice of violating and failing to comply with the requirements of Regulation X of RESPA with respect to Plaintiffs and the class members.

160.  Plaintiffs submitted a "complete loss mitigation application" on September 14, 2020, as that phrase is used in Regulation X of RESPA.  At the time Plaintiffs submitted this application there was no scheduled foreclosure date and, therefore, there was more than 90 days before a foreclosure sale.  Plaintiffs' complete loss mitigation application was submitted and remained outstanding prior to the "first notice or filing required by applicable law for any judicial or non-judicial foreclosure process" as that phrase is used in 12 C.F.R. 1024.41(f)(1) ("Prohibition on foreclosure referral").

## Violations of 12 C.F.R. § 1024.41(b)(1)

### (Reasonable Diligence)

161.   Pursuant to 12 C.F.R. 1024.41(b)(1), a servicer shall exercise reasonable diligence in obtaining documents and information to complete a loss mitigation application.

162.   Servicer violated 12 C.F.R. § 1024.41(b)(1) and failed to exercise reasonable diligence by not providing Plaintiffs with accurate information regarding Plaintiffs' Loss Mitigation Application.  Rather, Servicer repeatedly provided false, misleading inaccurate and inconsistent information about the documents and information needed to complete Plaintiffs' Loss Mitigation Application. As alleged herein, Servicer falsified letters to indicate that Plaintiffs' Application was missing documents which had been previously submitted.  Further, at certain times, Servicer stated that the Application was complete but would then send a notice claiming additional documents were outstanding and that the Application was incomplete. Servicer also failed to keep a designated point of contact available to Plaintiffs as required by Regulation X and thereby provided false, misleading, inaccurate and inconsistent information regarding the documents and information needed to complete Plaintiffs' Loss Mitigation Application.  Plaintiffs are informed and believe that the class members experienced the same violations.

163.   Servicer violated 12 C.F.R. § 1024.41(b)(1) and failed to exercise reasonable diligence by sending Plaintiffs erroneous "incomplete application" letters which falsely repeated that documents were missing from Plaintiffs' Loss Mitigation Application.  Servicer failed to exercise reasonable diligence in drafting said letters and failed to accurately review Plaintiffs' Loss Mitigation Application to determine what documents had been received from Plaintiffs. Had such reasonable diligence been exercised, Servicer would have not sent out the confusing, misleading and false incomplete application notifications.  Plaintiffs are informed and believe that the class members experienced the same violations.

164.   Servicer violated 12 C.F.R. 1024.41(b)(1) and failed to exercise reasonable diligence by requiring Plaintiffs to resubmit duplicative documentation after they submitted their original loan modification application and associated documents.  Plaintiffs are informed and believe that the class members experienced the same violations.

## Violations of 12 C.F.R. § 1024.41(b)(2)

## (Loss Mitigation Review)

165.   Pursuant to 12 C.F.R. § 1024.41(b)(2), "If a servicer receives a loss mitigation application 45 days or more before a foreclosure sale, a servicer shall:

a. Promptly upon receipt of a loss mitigation application, review the loss mitigation application to determine if the loss mitigation application is complete; and

b. Notify the borrower in writing within 5 days (excluding legal public holidays, Saturdays, and Sundays) after receiving the loss mitigation application that the servicer acknowledges receipt of the loss mitigation application and that the servicer has determined that the loss mitigation application is either complete or incomplete. If a loss mitigation application is incomplete, the notice shall state the additional documents and information the borrower must submit to make the loss mitigation application complete and the applicable date pursuant to paragraph (b)(2)(ii) of this section. The notice to the borrower shall include a statement that the borrower should consider contacting servicers of any other mortgage loans secured by the same property to discuss available loss mitigation options."

166.   On September 16, 2020, Plaintiffs submitted a complete loss mitigation application to Servicer at a time when not foreclosure sale had been scheduled.

167.   Servicer violated 12 C.F.R. § 1024.41(b)(2) by falsely notify Plaintiffs that Plaintiffs' complete loan modification application was missing documents which

**FIRST AMENDED CLASS ACTION COMPLAINT**

had already been submitted. Plaintiffs are informed and believe that the class members experienced the same violations.

168. Servicer violated 12 C.F.R. § 1024.41(b)(2), by failing to provide Plaintiffs with written acknowledgement of receipt of Plaintiffs' complete loss mitigation application until October 28, 2020. Plaintiffs are informed and believe that the class members experienced the same violations.

## **Violation of § 1024.41(c)(1)**
## **(Evaluation of Loss Mitigation Applications)**

169. Pursuant to 12 C.F.R. § 1024.41(c), if a servicer receives a complete loss mitigation application more than 37 days before a foreclosure sale, then, within 30 days of receiving a borrower's complete loss mitigation application, a servicer shall (i) evaluate the borrower for all loss mitigation options available to the borrower and (ii) provide the borrower with a notice in writing stating the servicer's determination of which loss mitigation options, if any, it will offer to the borrower on behalf of the owner or assignee of the mortgage. The servicer shall include in this notice the amount of time the borrower has to accept or reject an offer of a loss mitigation program as provided for in paragraph (e) of this section, if applicable, and a notification, if applicable, that the borrower has the right to appeal the denial of any loan modification option as well as the amount of time the borrower has to file such an appeal and any requirements for making an appeal, as provided for in paragraph (h) of this section.

170. Plaintiffs submitted a complete loss mitigation application to Servicer on September 14, 2020.

171. Servicer violated 12 C.F.R. § 1024.41(c)(1) by failing to (i) evaluate Plaintiffs for all available loss mitigation options or (ii) provide Plaintiffs with a notice in writing stating Servicer's determination of which loss mitigation options, if any, it will offer to Plaintiffs on behalf of the owner or assignee of the mortgage loan

within 30 days of receiving Plaintiffs' loss mitigation application. Plaintiffs are informed and believe that the class members experienced the same violations.

## Violation of § 1024.41(c)(2)(iii)

## (Short-Term Loss Mitigation Options)

172.   To the extent that Servicer claims it extended a short-term loss mitigation option to Plaintiffs, Servicer violation to 12 C.F.R. § 1024.41(c)(2)(iii) by failing to Plaintiffs a "written notice stating the specific payment terms and duration of the program or plan, that the servicer offered the program or plan based on an evaluation of an incomplete application, that other loss mitigation options may be available, and that the borrower has the option to submit a complete loss mitigation application to receive an evaluation for all loss mitigation options available to the borrower regardless of whether the borrower accepts the program or plan."

## Violation of § 1024.41(c)(2)(iv)

## (Facially Complete Application)

173.   Pursuant to 12 C.F.R. § 1024.41(c)(2)(iv), A loss mitigation application shall be considered facially complete:

  a. when a borrower submits all the missing documents and information as stated in the notice required under paragraph (b)(2)(i)(B) of this section,

  b. when no additional information is requested in such notice, or

  c. once the servicer is required to provide the borrower a written notice pursuant to paragraph (c)(3)(i) (notice of complete application) of this section.

174.   Further, "[i]f the servicer later discovers that additional information or corrections to a previously submitted document are required to complete the application, the servicer must promptly request the missing information or corrected documents and *treat the application as complete for the purposes of paragraph (f)(2)*

**FIRST AMENDED CLASS ACTION COMPLAINT**

*and (g)* of this section until the borrower is given a reasonable opportunity to complete the application." 12 C.F.R. § 1024.41(c)(2)(iv) (emphasis added).

175. Finally, "[i]f a borrower submits all the missing documents and information as stated in the notice required pursuant to § 1026.41(b)(2)(i)(B), or no additional information is requested in such notice, *the application shall be considered facially complete*. … If the borrower completes the application within this period, *the application shall be considered complete as of the date it was facially complete*, for the purposes of paragraphs (d), (e), (f)(2), (g), and (h) of this section…" 12 C.F.R. § 1024.41(c)(2)(iv) (emphasis added).

176. On September 14, 2020, Plaintiffs submitted a loss mitigation application to Servicer which was either complete or facially complete. By October 15, 2020, Servicer had received all items and documents requested rendering Plaintiffs' loss mitigation application fully and actually complete.

177. Servicer violation to 12 C.F.R. § 1024.41(c)(2)(iv) by failing to consider and treat Plaintiffs' loss mitigation application as "complete" as required by Regulation X by October 15, 2020.  Plaintiffs are informed and believe that the class members experienced the same violations.

**<u>Violations of § 1024.41(c)(2)(v)</u>**

**<u>(RESPA Covid-19 Forbearance Plan)</u>**

178. On July 31, 2020, Servicer sent Plaintiffs a letter (the ***"Forbearance Letter"***) acknowledging an "incomplete loss mitigation application" and approving Plaintiffs for a Covid-19 forbearance plan (the ***"Forbearance Plan"***).  As stated in the Forbearance Letter, Plaintiffs "were approved for, and accepted, a Forbearance Plan based on an evaluation of an incomplete loss mitigation application."  Further, the Forbearance Letter states, "we will reach out to you at least 30 days prior to the end of the Forbearance Plan to discuss your situation and provide additional information regarding options that may be available to you."

179.   Pursuant to the Forbearance Letter, Servicer offered, and Plaintiffs accepted, the Forbearance Plan based upon Servicer's evaluation of an incomplete application as contemplated by 12 C.F.R. § 1024.41(c)(2)(v)(A).

180.   Pursuant to § 1024.41(c)(2)(v)(A), Servicer was required to provide the following protections and benefits as part of Plaintiffs' Forbearance Plan:

    a.  Paragraph (c)(2)(v)(A)(1): Servicer must delay payment of "covered amounts" until the mortgage loan is refinanced, the mortgaged property is sold, or the term of the mortgage loan ends.

    b.  Paragraph (c)(2)(v)(A)(2): Servicer cannot charge or accrue interest for any "covered amounts."

    c.  Paragraph (c)(2)(v)(A)(3): Servicer must end any preexisting delinquency on the mortgage loan upon Plaintiffs' acceptance of the Forbearance Plan.

181.   For purposes of paragraph (c)(2)(v)(A), "covered amounts" includes, without limitation, all *principal and interest payments forborne under a payment forbearance program* made available to borrowers experiencing a financial hardship due, directly or indirectly, to the COVID-19 emergency; it also includes, without limitation, *all other principal and interest payments that are due and unpaid by a borrower* experiencing financial hardship due, directly or indirectly, to the COVID-19 emergency. 12 U.S.C. § 1024.41(c)(2)(v)(A)(1) *(emphasis added)*.  For purposes of paragraph (c)(2)(v)(A)(1), "the term of the mortgage loan" means the term of the mortgage loan according to the obligation between the parties in effect when the borrower is offered the loss mitigation option. *Id.*

182.   Servicer failed to provide the specific terms and duration of the Forbearance Plan to Plaintiffs and never provide any written notification regarding the expiration of said plan.

183.   Servicer failed to contact Plaintiffs 30 days prior to any expiration of the Forbearance Plan.   Plaintiffs are informed and believe that they are still in the Forbearance Plan.

184.   Servicer was prohibited from filing the Notice of Default against Plaintiffs Property while Plaintiffs were protected by the Forbearance Plan.

185.   Servicer Filed the Notice of Default and commenced foreclosure while Plaintiffs were protected by the Forbearance Plan.

186.   Servicer violated § 1024.41(c)(2)(v)(A) when it failed to end all pre-existing delinquency on the Loan at the time Plaintiffs acceptance the Forbearance Plan and when it recorded the Notice of Default and commenced foreclosure based upon payments alleged to be due and unpaid which accrued during the Forbearance Plan and which are "covered amounts" under paragraph (c)(2)(v)(A)(1).   Plaintiffs are informed and believe that the class members experienced the same violations.

187.   Servicer violated § 1024.41(c)(2)(v)(A) when it charged foreclosure filing fees and attorney fees for the foreclosure action and attempted to collect those charges pursuant to the mortgage statement dated November 10, 2020, which included amounts for those improper fees.   Plaintiffs are informed and believe that the class members experienced the same violations.

188.   Servicer violated § 1024.41(c)(2)(v)(A) by charging interest on "covered amounts" during the forbearance period and attempted to collect those charges pursuant to the mortgage statement dated November 10, 2020, which were covered amounts included in the Forbearance Plan.   Plaintiffs are informed and believe that the class members experienced the same violations.

189.   Servicer violated § 1024.41(c)(2)(v)(A)(2) by charging and attempting to collect penalties, foreclosure costs, attorneys' fees, pre-existing late fees and other similar charges that were required to be waived promptly upon Plaintiffs' acceptance of the Forbearance Plan.  Plaintiffs are informed and believe that the class members experienced the same violations.

**FIRST AMENDED CLASS ACTION COMPLAINT**

190.   Servicer violated § 1024.41(c)(2)(v)(A)(3) by failing to end all pre-existing delinquency on the mortgage loan at the time Plaintiffs acceptance the Forbearance Plan pursuant to paragraph (c)(2)(v)(A) of this section and recording a Notice of Default based upon the alleged delinquency, charging foreclosure costs and attorneys' fees for said improper action, and, further, by making a demand for payment of such amounts in the mortgage statement dated November 10, 2020. Plaintiffs are informed and believe that the class members experienced the same violations.

<u>**Violation of 12 C.F.R. 1024.41(c)(3)**</u>

<u>**(Notification of Complete Application)**</u>

191.   Servicer violated 12 C.F.R. § 1024.41(c)(3)(i), by failing to notify Plaintiffs within 5 days of receiving Plaintiffs' complete loss mitigation application that: (a) that Plaintiffs' loss mitigation application was complete; (b) the date the servicer received the complete application; (c) that the servicer expects to complete its evaluation within 30 days of the date it received the complete application; (d) that the borrower is entitled to certain foreclosure protections because the servicer has received the complete application, and, the servicer has not made the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process, that the servicer cannot make the first notice or filing required to commence or initiate the foreclosure process under applicable law before evaluating the borrower's complete application; (e) that the servicer may need additional information at a later date to evaluate the application, in which case the servicer will request that information from the borrower and give the borrower a reasonable opportunity to submit it, the evaluation process may take longer, and the foreclosure protections could end if the servicer does not receive the information as requested; and (f) that the borrower may be entitled to additional protections under State or Federal law. Plaintiffs are informed and believe that the class members experienced the same violations.

**FIRST AMENDED CLASS ACTION COMPLAINT**

1

2

**<u>Violation of § 1024.41(d)</u>**

**<u>(Denial of Loan Modification Options)</u>**

3

4

5

6

7

192.   Servicer violated 12 C.F.R. § 1024.41(d) by failing to include in the denial of Plaintiffs' loss mitigation application "the specific reason or reasons for the servicer's determination for each such trial or permanent loan modification option." Plaintiffs are informed and believe that the class members experienced the same violations.

8

9

10

11

12

13

14

15

16

17

18

19

193.   To the extent that Servicer's late-delivered Loss Mitigation Denial Letter was meant to comply with §§ 1024.41(d), it falls woefully short.  First, it was not sent within 30 days of Servicer's receipt of Plaintiffs' complete Loss Mitigation Application.  Second, it does not state all the trial or permanent loan modification options available to the Plaintiffs and the specific reasons for denial of those options. Third, Servicer's reason of "insufficient income" does not constitute a "specific reason […] for the servicer's determination" within the meaning of 12 C.F.R. § 1024.41(d)(1).  Fourth, it falsely states that the "COVID Forbearance Plan" is not available due to the delinquent balance on the mortgage.  However, Plaintiffs were actively in the Covid-19 forbearance plan with Servicer as indicated by the Servicer's letter dated July 31, 2020.  Plaintiffs are informed and believe that the class members experienced the same violations.

20

21

22

23

24

25

26

27

194.   Servicer does not explain the terms of the program for which the Plaintiffs were evaluated and denied, does not state what income was used to evaluate Plaintiffs and does not specify what amount is needed to "achieve a payment that would qualify for the program."  And, to the extent the program(s) was/were based on a requirement of the owner or assignee of the borrower's mortgage loan, then the denial notice failed to state the requirement that is the basis of the denial.  12 C.F.R. § 1024, Supp. I, § 41(d) cmt. 1. Plaintiffs are informed and believe that the class members experienced the same violations.

28

**FIRST AMENDED CLASS ACTION COMPLAINT**

195.   To the extent that Servicer's Loss Mitigation Denial Letter include denials that may be based upon a net present value calculation (which appears to be the case here), Servicer violated 12 C.F.R. §1024(d) by failing to include all the inputs used in the net present value calculation. 12 C.F.R. § 1024, Supp. I, § 41(d) cmt. 2.   Plaintiffs are informed and believe that the class members experienced the same violations.

### Violation of § 1024.41(h)

### (Appeal Process)

196.   By failing to provide the required specificity and the details of the various denials in the Loss Mitigation Denial Letter, Servicer also violated 12 C.F.R. § 1024.41(h) by not allowing Plaintiffs an opportunity to present an appeal Servicer's denial of available loss mitigation programs. Plaintiffs are informed and believe that the class members experienced the same violations.

### Violation of § 1024.41(f)(2)

### (Prohibition on Foreclosure Referral)

197.   Pursuant to 12 C.F.R. § 1024.41(f)(2), "If a borrower submits a complete loss mitigation application during the pre-foreclosure review period […] or before a servicer has made the first notice of filing required by applicable law for any judicial or non-judicial foreclosure process, a servicer shall not make the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process unless: (i) The servicer has sent the borrower a notice pursuant to paragraph (c)(1)(ii) of this section that the borrower is not eligible for any loss mitigation option and the appeal process in paragraph (h) of this section is not applicable, the borrower has not requested an appeal within the applicable time period for requesting an appeal, or the borrower's appeal has been denied"

198.   Plaintiffs' Loss Mitigation Application was either complete or facially complete as of October 15, 2020 for purposes of applying protections under 12 C.F.R. § 1024.41(f).

199.   Plaintiffs' Loss Mitigation Application was submitted and remained outstanding prior to the "first notice of filing required by applicable law for any judicial or non-judicial foreclosure process" as that phrase is used in 12 C.F.R. 1024.41(f)(1).

200.   Servicer violated to 12 C.F.R. § 1024.41(f)(2), by recording the Notice of Default on October 20, 2020.  Plaintiffs are informed and believe that the class members experienced the same violations.

### **Harm to Plaintiffs and The Class Members**

201.   Servicer's violations of Regulation X were prejudicial and harmful to Plaintiffs and the class members because those violations:

    a.   deprived Plaintiffs and the class members of the rights and protections under RESPA.

    b.   deprived Plaintiffs and the class members of a reasonable opportunity to be reviewed and evaluated for all available loss mitigation options.

    c.   deprived Plaintiffs and the class members of a reasonable opportunity to be reviewed and evaluated for loan modifications that would cure their mortgage default.

    d.   deprived Plaintiffs and the class members of any opportunity to prevent the initiation of the foreclosure proceedings against their homes.

    e.   prevented Plaintiffs and the class members from reasonably assessing their situation and avoiding foreclosure at pivotal times when such information would have made a difference.

    d.   prevented Plaintiffs and the class members from seeking other remedies, such as refinance, bankruptcy reorganization, or curing the default in order to avoid foreclosure, while awaiting a valid response to their loss mitigation requests.

f.   Substantially, unnecessarily and unreasonably delayed the loss mitigation process which exposed Plaintiffs and the class members to additional costs and fees and facilitated the commencement of foreclosure proceedings which further escalated the costs and fees charged by the Servicer and its Trustee.

202.   As a result of Servicer's violations of Regulation X, Plaintiffs have suffered actual damages as follows:

a.   Plaintiffs and the class members were unable to secure a mortgage modification, unable to resume making mortgage payments, remained in delinquent status and have been assessed ongoing, unnecessary, and, in some cases, illegal late fees, foreclosure costs, foreclosure attorney fees and other costs and fees charged by Servicer and Trustee.

e.   Plaintiffs and the class members relinquished or abandoned other options such as refinance, cure, bankruptcy in reliance upon Servicer's actions toward a final loss mitigation options which was improperly delayed by the Servicer's violations of Regulation X.

b.   Plaintiffs' and the class members' homes were illegally placed into active foreclosure when Servicer and its Trustee recorded the Notice of Default. Plaintiffs now face an imminent and unlawful foreclosure auction.

c.   Plaintiffs and the class members expended considerable time, energy, effort and money pursuing the loss mitigation process and complying with Servicer's demands to produce documents which Servicer either lost or ignored.

**FIRST AMENDED CLASS ACTION COMPLAINT**

d.   Plaintiffs and the class members expended time and money preparing their financial information for their Loss Mitigation Application, as well as considerable time and effort preparing, providing, and vouching for the truth of their financial information and making repeated copies of documents, coordinating with their banks for documents, which would have been minimized or avoided had Servicer complied with Regulation X. This additional and unnecessary time and effort spent on the loss mitigation process of many, many months was at the expense of devoted time and effort to their struggling business and their ongoing financial and medical issues.

e.   Plaintiffs and the class members were forced to incur administrative costs such as postage, travel expenses, photocopying, scanning, and facsimile expenses pursuing the loss mitigation process, which they would not have incurred if Servicer had complied with Regulation X. Servicer's violations of Regulation X have unreasonably and improperly increased the time, energy, effort and money required by Plaintiffs in pursuing the loss mitigation process.

f.   Plaintiffs have been charged thousands of dollars in foreclosure related costs and fees by Servicer as a direct result of Servicer's violations of Regulation X. Plaintiff is informed and believes class members have been accessed similar charges.

f.   Plaintiffs have been assessed "property inspection fees" by Servicer as a direct result of Servicer's violations of Regulation X. Plaintiff is informed and believes class members have been accessed similar charges.

g.    Plaintiffs have also suffered emotional damages in the form of fear and anxiety resulting from the continual threat of foreclosure and eviction resulting from Servicer's violations of Regulation X.

g.    Plaintiffs are informed and believe and thereupon allege that Servicer provided adverse information to consumer reporting agencies and, thereby, Plaintiffs have suffered improper credit damage as a direct result of Servicer's violations of Regulation X. Plaintiff is informed and believes class members have suffered similar damage.

h.    Plaintiffs have expended money in seeking legal redress as well in order to protect their real property rights pursuant to RESPA. Plaintiff is informed and believes class members have suffered similar damage.

203.    Plaintiffs and the class members allege that Servicer's conduct in this case constitutes a willful violation of the applicable provisions of Regulation X of RESPA.  As a result of Servicer's actions in violation of RESPA, Servicer is liable to Plaintiffs and the class members for actual damages, statutory damages, costs, and attorney's fees.

204.    Whether Plaintiffs or the class members have actually paid any such costs or fees which were assessed by Servicer is irrelevant to the damages analysis. Numerous courts have held that assessed fees can constitute damages under RESPA, even if Plaintiffs or the class members have not paid them. *See, e.g.*, *Claude v. Wells Fargo Home Mortg.*, No. 3:13-CV-00535, 2014 WL 4073215, at *5 (D. Conn. Aug. 14, 2014) ("the servicer wrongfully imposed late fees"); *Allen v. Bank of Amer. Corp.*, No. CCB-11-33, 2011 WL 3654451, at *5 (D. Md. Aug. 18, 2011) (plaintiffs stated claim under RESPA for improper "imposition" of late fees).

## SECOND CAUSE OF ACTION

## VIOLATIONS OF CALIFORNIA'S HOMEOWNER BILL OF RIGHTS (SERVICER)

### *(By Plaintiffs, on behalf of the proposed California Servicer Subclass, Against Defendant Servicer, including DOES 1-3 & 7-10)*

205.   Plaintiffs reallege and incorporate by reference all previous paragraphs and allegations above as though fully set forth herein.

206.   On September 14, 2020, at a time when no foreclosure auction had been scheduled, Plaintiffs requested a loan modification under California's Homeowner Bill of Rights (**"HBOR"**) by delivering a full and complete loan modification application to Servicer which contained all of the information required by Servicer in order to make a final decision on Plaintiff's loan modification application.  Any and all additional information required or requested by Servicer was delivered on or before October 15, 2020. Plaintiffs are informed and believe that the class members submitted the same request to Servicer.

### Violation of § 2923.6

207.   Servicer violated Cal. Civ. Code § 2923.6 by recording the NOD while Plaintiffs first lien loan modification application was pending.   Plaintiffs are informed and believe that the class members experienced the same violations.

208.   Plaintiffs and class members have been harmed by the above violations of Cal. Civ. Code § 2923.6 in that Plaintiffs and class members have been charged costs and fees associated with foreclosure, title to their homes has been clouded by the recorded foreclosure documents which makes refinance impossible, the default amount on their mortgages have increased based upon the delay caused by the foreclosure and the costs associated therewith making loan modification impossible and they had to retain counsel and pay costs and fees in prosecuting their claims hereunder.

209.   Despite the rescission of the NOD, Servicer has failed to correct or remediate the above alleged material violations of Cal. Civ. Code § 2923.6 in that none of the illegal charges and fees have been removed from Plaintiffs' mortgage balance and Plaintiffs have not been allowed to secure its attorneys' fees as allowed under Cal. Civ. Code § 2924.12.

210.   Based upon these material violations of Cal. Civ. Code § 2923.6, Plaintiffs and class members are entitled to an injunction under Cal. Civ. Code § 2924.12 stopping any further foreclosure action against their properties and an award for attorney's fees and costs.   Plaintiffs and the class members further allege that Defendants' violation of these provisions of the HBOR was knowing, malicious, willful and reckless.

## **Violation of § 2923.7**

211.   HBOR specifically requires that upon a request for a "foreclosure prevention alternative, the mortgage servicer shall promptly establish a single point of contact and provide to the borrower one or more direct means of communicating with the single point of contact" and that "[t]he single point of contact shall remain assigned to the borrower's account until the mortgage servicer determines that all loss mitigation options offered by, or through, the mortgage servicer have been exhausted or the borrower's account becomes current." Cal. Civ. Code § 2923.7.

212.   Plaintiffs requested a foreclosure prevention alternative from Servicer on or before May 12, 2020.   Plaintiffs are informed and believe that the class members submitted similar requests to Servicer.

213.   Servicer failed to promptly establish a single point of contact for Plaintiffs and the class members.   Rather, immediately upon Plaintiffs' request for a foreclosure prevention alternative, Servicer began shunting Plaintiffs among various employees who gave inconsistent, conflicting and erroneous information.   Plaintiffs' interactions with non-SPOC employees include no less than 24 people at the Servicer, including the following individuals: *Bill Delisle, Bryce Conklin, Carlos*

*Castillo, Carlos Lopez, Christine Mixon, Crystal Lujano, Curtis Walker, Desiree Rodriguez, Elle, Gary Rutenber, Greg Hunter, Jack Kling, James Palikan, Jim Lawlor, Kedrick Gray, Kyle Williams, Lou Visconti, Mary Cabello, Megan Marshburn, Shanetta Bowen, Tamica, Tom Adler, Tosha Crockrell, and Trecia Smith*. Plaintiffs are informed and believe that the class members experienced the same violations.

214.   Servicer delivered numerous letters and written demands from unidentified employees and directed Plaintiffs to call the general customer servicer number.  Plaintiffs never had a method to directly contact the SPOC.  Plaintiffs are informed and believe that the class members experienced the same violations.

215.   Servicer violated Cal. Civ. Code § 2923.7(a), by failing to provide Plaintiffs and the class members one or more direct means of communicating with the single point of contact.   Plaintiffs are informed and believe that the class members experienced the same violations.

216.   Servicer violated Cal. Civ. Code § 2923.7(c), by failing keep a single point of contact assigned to the borrower's account until the mortgage servicer determines that all loss mitigation options offered by, or through, the mortgage servicer have been exhausted or the borrower's account becomes current.  Plaintiffs are informed and believe that the class members experienced the same violations.

217.   Servicer violated Cal. Civ. Code § 2923.7(b), by assigning individuals to Plaintiffs' and the class members' loss mitigation request who:

    a.  Failed to communicate the process by which Plaintiffs may apply for an available foreclosure prevention alternative and the deadline for any required submissions to be considered for these options.

    b.  Failed to coordinate receipt of all documents associated with available foreclosure prevention alternatives and notify Plaintiffs of any missing documents necessary to complete the application.

c. Failed to have access to current information and personnel sufficient to timely, accurately, and adequately inform Plaintiffs of the current status of the foreclosure prevention alternative.

d. Failed to ensure that Plaintiffs were considered for all foreclosure prevention alternatives offered by, or through, the mortgage servicer, if any.

e. Failed to have access to individuals with the ability and authority to stop foreclosure proceedings when necessary.

Plaintiffs are informed and believe that the class members experienced the same violations.

218.   As a result of Servicer's violations of § 2923.7 alleged above, Plaintiffs and the class members were illegally dual tracked which resulted in the illegal commencement of foreclosure actions and the recording of illegal notices of default or notices of trustee's sale.

219.   Servicer's violations of § 2923.7 resulted in Plaintiffs and class members forgoing other available loss mitigation options such as refinance, bankruptcy or curing the default.

220.   Further, Servicer's violations of § 2923.7 resulted in significant costs and fees charged to Plaintiffs' and the class members' mortgages, including, without limitation, late fees, foreclosure filing fees, inspection fees, and foreclosure attorney and trustee fees.

221.   Further, Servicer's violations of § 2923.7 resulted in Plaintiffs and the class members incurring additional out-of-pocket costs for responding to the erroneous demands from Servicer's employees, including, without limitation, printing, scanning, faxing, mailing and travel costs associated with redundant and unnecessary document production.

222.   Had Servicer complied with § 2923.7, Plaintiffs and class members would not have been charged illegal foreclosure filing fees which made a successful loan modification impossible.

223.   Had Servicer complied with § 2923.7, Plaintiffs and class members would have been able to avoid illegal dual tracking and the illegal clouding of title to their homes which precluded options to refinance their mortgages.

224.   Had Servicer complied with § 2923.7, Plaintiffs and class members would not have suffered extended delays in the loss mitigation process which increased the mortgage balances and made loan modification impossible.

225.   Had Servicer complied with § 2923.7, Plaintiffs and class members would have been properly reviewed and approved for an available loss mitigation option.

226.   Plaintiffs and class members have been materially harmed by the above violations of Cal. Civ. Code § 2923.7 in that Plaintiffs and class members have been charged costs and fees associated with foreclosure; title to their homes has been clouded by the recorded foreclosure documents, which makes refinance impossible; the default amount on their mortgages have increased based upon the delay caused by the foreclosure and the costs associated therewith, making loan modification impossible; and they had to retain counsel and pay costs and fees in prosecuting their claims hereunder.

227.   Despite the rescission of the NOD, Servicer has failed to correct or remediate the above alleged material violations of Cal. Civ. Code § 2923.7 in that none of the illegal charges and fees have been removed from Plaintiffs' mortgage balance, and Plaintiffs have not had all foreclosure alternatives reviewed, have not been given a valid opportunity to appeal the wrongful denial of Plaintiffs' loss mitigation request, have no valid SPOC assigned to their Loan and have not been allowed to secure their attorneys' fees as allowed under Cal. Civ. Code § 2924.12.

228.   Based upon these material violations of Cal. Civ. Code § 2923.7, Plaintiffs and class members are entitled to an injunction under Cal. Civ. Code § 2924.12 stopping any further foreclosure action against their properties and an award for attorney's fees and costs.   Plaintiffs and the class members further allege that Defendants' violation of these provisions of the HBOR was knowing, malicious, willful and reckless.

## Violation of § 2924.10

229.   Servicer violated Cal. Civ. Code § 2924.10 by failing to provide a timely and valid written acknowledgment of the receipt of Plaintiffs' and the class members loss mitigation applications which was required to include the following information:

    a. A description of the loan modification process, including an estimate of when a decision on the loan modification will be made after a complete application has been submitted by the borrower and the length of time the borrower will have to consider an offer of a loan modification or other foreclosure prevention alternative.

    b. Any deadlines, including deadlines to submit missing documentation, that would affect the processing of a first lien loan modification application.

    c. Any expiration dates for submitted documents.

    d. Any deficiency in the borrower's first lien loan modification application.

230.   As a result of Servicer's violations of § 2924.10 alleged above, Plaintiffs and the class members were improperly delayed in their loss mitigation requests and illegally dual tracked which resulted in illegal commencement of foreclosure actions along with illegal notices of default and notices of trustee's sales to be filed and recorded against Plaintiffs' and class members' homes.

**FIRST AMENDED CLASS ACTION COMPLAINT**

231.   Servicer's violations of § 2924.10 resulted in Plaintiffs and class members forgoing other available loss mitigation options such as refinance, bankruptcy or curing the default based upon the improper delay in being reviewed for loss mitigation options available to Plaintiffs and class members from Servicer.

232.   Servicer's violations of § 2924.10 resulted in significant costs and fees charged to Plaintiffs' and the class members' mortgages, including, without limitation, late fees, foreclosure filing fees, inspection fees, and foreclosure attorney and trustee fees based upon the improper delay in being reviewed for loss mitigation options available to Plaintiffs and class members from Servicer.

233.   Servicer's violations of § 2924.10 resulted in Plaintiffs and the class members incurring additional out-of-pocket costs for responding to the erroneous demands from Servicer's employees, including, without limitation, printing, scanning, faxing, mailing and travel costs associated with redundant and unnecessary document production.

234.   Had Servicer complied with § 2924.10, Plaintiffs and class members would not have been charged illegal foreclosure filing fees which made a successful loan modification impossible.

235.   Had Servicer complied with § 2924.10, Plaintiffs and class members would have been able to avoid illegal dual tracking and the illegal clouding of title to their homes which precluded options to refinance their mortgages.

236.   Had Servicer complied with § 2924.10, Plaintiffs and class members would not have suffered extended delays in the loss mitigation process which increased the mortgage balances and made loan modification impossible.

237.   Had Servicer complied with § 2924.10, Plaintiffs and class members would have been properly reviewed and approved for an available loss mitigation option.

238.   Plaintiffs and class members have been materially harmed by the above violations of Cal. Civ. Code § 2924.10 in that Plaintiffs and class members have been

charged costs and fees associated with foreclosure, title to their homes has been clouded by the recorded foreclosure documents which makes refinance impossible, the default amount on their mortgages have increased based upon the delay caused by the foreclosure and the costs associated therewith making loan modification impossible and they had to retain counsel and pay costs and fees in prosecuting their claims hereunder.

239.   Despite the rescission of the NOD, Servicer has failed to correct or remediate the above alleged material violations of Cal. Civ. Code § 2924.10 in that none of the illegal charges and fees have been removed from Plaintiffs' mortgage balance, and Plaintiffs have not had all foreclosure alternatives reviewed, have not been given a valid opportunity to appeal the wrongful denial of Plaintiffs' loss mitigation request, and have not been allowed to secure their attorneys' fees as allowed under Cal. Civ. Code § 2924.12.

240.   Based upon these material violations of Cal. Civ. Code § 2924.10, Plaintiffs and class members are entitled to an injunction under Cal. Civ. Code § 2924.12 stopping any further foreclosure action against their properties and an award for attorney's fees and costs.   Plaintiffs and the class members further allege that Defendants' violation of these provisions of the HBOR was knowing, malicious, willful and reckless.

## Violation of § 2924.11

241.   Servicer violated Cal. Civ. Code § 2924.11 by charging, collecting or attempting to collect inspection fees, title fees, foreclosure costs and fees and other prohibited amounts during periods which Plaintiffs' complete first lien loan modification application was outstanding.   Plaintiffs are informed and believe that the class members experienced the same violations.

242.   Despite the rescission of the NOD, Servicer has failed to correct or remediate the above alleged material violations of Cal. Civ. Code § 2924.11 in that none of the illegal charges and fees have been removed from Plaintiffs' mortgage

balance (in fact, Servicer charged Plaintiffs for the *removal* of the illegal NOD) and Plaintiffs have not been allowed to secure its attorneys' fees as allowed under Cal. Civ. Code § 2924.12.

243.   Based upon these material violations of Cal. Civ. Code § 2924.11, Plaintiffs and class members are entitled to an injunction under Cal. Civ. Code § 2924.12 stopping any further foreclosure action against the Property, reversal of the improper charges to their Loan, and an award for attorney's fees and costs.  Plaintiffs further allege that Defendants' violation of these provisions of the HBOR was willful or reckless.

## **Violations of § 2924.17**

244.   Section 2924.17 of HBOR requires that any notice of default, notice of sale, assignment of a deed of trust, or substitution of trustee recorded by or on behalf of a mortgage servicer in connection with a foreclosure subject to the requirements of Section 2924, or a declaration or affidavit filed in any court relative to a foreclosure proceeding be accurate and complete and supported by competent and reliable evidence.

245.   Servicer had no legal right to record the NOD as the same was prohibited by law.

246.   Servicer violated Section 2924.17 of HBOR by failing to review competent and reliable evidence prior to recording and filing the NOD. Plaintiffs are informed and believe that the class members experienced the same violations.

247.   Servicer violated Section 2924.17 of HBOR by recording an inaccurate NOD. Plaintiffs are informed and believe that the class members experienced the same violations.

248.   Plaintiffs and class members have been materially harmed by the above violations of Cal. Civ. Code § 2924.17 in that Plaintiffs and class members have been charged costs and fees associated with foreclosure, title to their homes has been clouded by the recorded foreclosure documents which makes refinance impossible,

the default amount on their mortgages have increased based upon the delay caused by the foreclosure and the costs associated therewith making loan modification impossible and they had to retain counsel and pay costs and fees in prosecuting their claims hereunder.

249.   Despite the rescission of the NOD, Servicer has failed to correct or remediate the above alleged material violations of Cal. Civ. Code § 2924.17 in that none of the illegal charges and fees have been removed from Plaintiffs' mortgage balance (in fact, Servicer charged Plaintiffs for the *removal* of the illegal NOD) and Plaintiffs have not been allowed to secure its attorneys' fees as allowed under Cal. Civ. Code § 2924.12.

250.   Based upon these material violations of Cal. Civ. Code § 2924.17, Plaintiffs and class members are entitled to an injunction under Cal. Civ. Code § 2924.12 stopping any further foreclosure action against the Property, reversal of the improper charges to their Loan, and an award for attorney's fees and costs.  Plaintiffs further allege that Defendants' violation of these provisions of the HBOR was willful or reckless.

## THIRD CAUSE OF ACTION
## VIOLATIONS OF CALIFORNIA'S HOMEOWNER BILL OF RIGHTS (TRUSTEE)
### *(By Plaintiffs, on behalf of the proposed California Trustee Subclass*
### *Against Defendant Trustee, including DOES 4-6 & 7-10)*

251.   Plaintiffs reallege and incorporate by reference all previous paragraphs and allegations above as though fully set forth herein.

252.   On September 14, 2020, at a time when no foreclosure auction had been scheduled, Plaintiffs requested a loan modification under California's Homeowner Bill of Rights (***"HBOR"***) by delivering a full and complete loan modification application to Servicer which contained all of the information required by Servicer in order to make a final decision on Plaintiffs' loan modification application.  Any and

**FIRST AMENDED CLASS ACTION COMPLAINT**

all additional information required or requested by Servicer was delivered on or before October 15, 2020. Plaintiffs are informed and believe that the class members submitted complete loan modification application to Servicer and that Trustee had knowledge of such submissions.

## Violation of § 2923.6

253.   Trustee violated Cal. Civ. Code § 2923.6 by recording the NOD while Plaintiffs first lien loan modification application was pending.   Plaintiffs are informed and believe that the class members experienced the same violations.

254.   Plaintiffs and class members have been materially harmed by the above violations of Cal. Civ. Code § 2923.6 in that Plaintiffs and class members have been charged costs and fees associated with foreclosure, title to their homes has been clouded by the recorded foreclosure documents which makes refinance impossible, the default amount on their mortgages have increased based upon the delay caused by the foreclosure and the costs associated therewith making loan modification impossible and they had to retain counsel and pay costs and fees in prosecuting their claims hereunder.

255.   Despite the rescission of the NOD, Servicer and Trustee have failed to correct or remediate the above alleged material violations of Cal. Civ. Code § 2923.6 in that none of the illegal charges and fees have been removed from Plaintiffs' mortgage balance and Plaintiffs have not been allowed to secure its attorneys' fees as allowed under Cal. Civ. Code § 2924.12.

256.   Based upon these material violations of Cal. Civ. Code § 2923.6, Plaintiffs and the class members are entitled to an injunction under Cal. Civ. Code § 2924.12 stopping any further foreclosure action against the Property, reversal of the improper charges to their Loan, and an award for attorney's fees and costs.   Plaintiffs further allege that Defendants' violation of these provisions of the HBOR was willful or reckless.

**Violation of § 2924.17**

257.   Section 2924.17 of HBOR requires that any notice of default, notice of sale, assignment of a deed of trust, or substitution of trustee recorded by or on behalf of a mortgage servicer in connection with a foreclosure subject to the requirements of Section 2924, or a declaration or affidavit filed in any court relative to a foreclosure proceeding be accurate and complete and supported by competent and reliable evidence.

258.   Trustee had no legal right to record the NOD as the same was prohibited by law.

259.   Trustee violated Section 2924.17 of HBOR by failing to review competent and reliable evidence prior to recording and filing the NOD. Plaintiffs are informed and believe that the class members experienced the same violations.

260.   Trustee violated Section 2924.17 of HBOR by recording an inaccurate NOD. Plaintiffs are informed and believe that the class members experienced the same violations.

261.   Plaintiffs and class members have been materially harmed by the above violations of Cal. Civ. Code § 2924.17 in that Plaintiffs and class members have been charged costs and fees associated with foreclosure, title to their homes has been clouded by the recorded foreclosure documents which makes refinance impossible, the default amount on their mortgages have increased based upon the delay caused by the foreclosure and the costs associated therewith making loan modification impossible and they had to retain counsel and pay costs and fees in prosecuting their claims hereunder.

262.   Despite the rescission of the NOD, Servicer has failed to correct or remediate the above alleged material violations of Cal. Civ. Code § 2924.17 in that none of the illegal charges and fees have been removed from Plaintiffs' mortgage balance and Plaintiffs have not been allowed to secure its attorneys' fees as allowed under Cal. Civ. Code § 2924.12.

263.   Based upon these material violations of Cal. Civ. Code § 2924.17, Plaintiffs and the class members are entitled to an injunction under Cal. Civ. Code § 2924.12 stopping any further foreclosure action against the Property, reversal of the improper charges to their Loan, and an award for attorney's fees and costs.  Plaintiffs further allege that Defendants' violation of these provisions of the HBOR was willful or reckless.

**FOURTH CAUSE OF ACTION**

**VIOLATIONS OF THE FEDERAL FAIR DEBT**

**COLLECTION PRACTICES ACT**

**(SERVICER)**

***(By Plaintiffs, on behalf of the proposed Nationwide Servicer Class***

***Against Defendant Servicer, including DOES 1-3 & 7-10)***

264.   Plaintiffs reallege and incorporate by reference all previous paragraphs and allegations above as though fully set forth herein.

265.   The Federal Fair Debt Collection Practices Act (***"FDCPA"***), 15 U.S.C. §§ 1692 *et. seq.*, prohibits the use of false, deceptive, misleading, harassing, abusive and offensive conduct by debt collectors during collection of consumer debts.

266.   Plaintiffs and members of the class are natural persons and "consumers" as defined under 15 U.S.C. § 1692a(3).

267.   The obligation between the parties is a "debt" owed as defined under 15 U.S.C. § 1692a(5) pursuant to the subject note and deed of trust.

268.   Servicer is a "debt collector" as defined under 15 U.S.C. § 1692a(6), as Servicer regularly attempts to collect debts owed to others through its mortgage servicing division.

269.   Servicer has engaged in acts or omissions prohibited by the FDCPA.

270.   A claim under the FDCPA is evaluated from the perspective of the least sophisticated consumer regardless of whether the consumer is represented by counsel.

## Violations of 15 U.S.C. § 1692e

271.   Pursuant to 15 U.S.C. § 1692e, a debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. This prohibition includes any false representations about "the character, amount, or legal status of any debt" along with any representation or implication that nonpayment of any debt will result in sale of any property of any person unless such action is lawful.

### False Deadline for Loss Mitigation Review

272.   On February 27, 2020, an unknown person at Fay Servicing sent Plaintiffs a letter regarding Plaintiffs' mortgage default which warned that "Fay Servicing LLC is a debt collector, and information you provide to us may be used to collect a debt." The letter states that, for borrowers in California, a full and complete loss mitigation application "must be received at least seven (7) days before a scheduled foreclosure sale in order for a borrower to be eligible for loss mitigation options." The letter goes on to state that failure to meet the deadline may result in a foreclosure sale of the subject property.

273.   This purported deadline is false and is contra to the requirement under HBOR that mortgage servicers must review all loss mitigation applications which are received at least 5 business days prior to a scheduled foreclosure.

274.   The February 27, 2020, letter falsely stated that Plaintiffs would not be eligible for any loss mitigation options if a loss mitigation application was not received "at least seven (7) days before a scheduled foreclosure sale." Servicer repeated this same improper threat in another letter dated August 13, 2020, which indicates a pattern and practice of falsely claiming that borrowers' eligibility for loss mitigation is dependent upon a false deadline. These letters are a wrongful collection tactic used by Servicer to dissuade borrowers from submitting loss mitigation requests during time which they are legally allowed to make said requests in hopes

that Servicer can collect the outstanding balance instead of being required to review borrowers for all foreclosure alternatives.

275.   Servicer violated 15 U.S.C. § 1692e(5), by threatening to take an action (i.e., refusing to review valid and lawful loss mitigation requests) when Servicer knew that such action was in violation of state and federal law.   Plaintiffs are informed and believe that the class members experienced the same violations.

## Illegal NOD – Illegal Threat of Foreclosure

276.   Pursuant to HBOR and RESPA, Servicer was prohibited from recording the Notice of Default on October 20, 2020.

277.   Servicer recorded the NOD in the public records and used the illegal threat of foreclosure to continue its debt collection against Plaintiffs.

278.   Servicer violated 15 U.S.C. § 1692e(5), by threatening to take legal action (continuation of the foreclosure process and setting of a foreclosure sale date) which Servicer knew was prohibited by state and federal law.  Plaintiffs are informed and believe that the class members experienced the same violations.

## Communicating False Credit Information

279.   Servicer violated 15 U.S.C. § 1692e(8), by communicating credit information to the Trustee and to the public regarding the Notice of Default (the purported right to foreclose on the defaulted debt) which Servicer knew or should have known to be false as that action is prohibited by state and federal law.  Plaintiffs are informed and believe that the class members experienced the same violations.

## Illegal Demand for Amounts Not Due

280.   Servicer violated 15 U.S.C. §§ 1692e(2)(A) when Servicer demanded Plaintiffs to pay $42,492.03 "as quickly as possible" to avoid the "negative impacts to your credit rating resulting from late payments and to avoid foreclosure" in the November 16, 2020 demand letter. Servicer was aware that all such amounts were included in the RESPA Covid-19 Forbearance Plan and were not collectible until Plaintiffs refinanced, sold the home, or came to the end of the mortgage term, none

of which occurred at the time of the illegal demand by Servicer. Plaintiffs are informed and believe that the class members experienced the same violations.

281.   Servicer violated of 15 U.S.C. § 1692e(4) by making false representations of the character, amount and legal status of the amounts purportedly due in the November 16, 2020 demand letter and also made improper and illegal threats regarding Plaintiffs' credit and risk of foreclosure and loss of property. Plaintiffs are informed and believe that the class members experienced the same violations.

282.   Servicer violated 15 U.S.C. § 1692e(5) by threatened to take action (negative credit reporting and foreclosure) in the November 16, 2020 demand letter which Servicer knew it could not legally take. Plaintiffs are informed and believe that the class members experienced the same violations.

283.   Servicer violated 15 U.S.C. § 1692e(8) by threatening to communicate false and negative credit information as set forth in the November 16, 2020 demand letter. Plaintiffs are informed and believe that the class members experienced the same violations.

284.   Servicer violated 15 U.S.C. § 1692e(10) by using a false representation and deceptive means to collect the amounts demanded in the November 16, 2020 demand letter which Servicer knew it could not legally collect at the time of the demand. Plaintiffs are informed and believe that the class members experienced the same violations.

## Violations of 15 U.S.C. § 1692f

285.   Pursuant to 15 U.S.C. § 1692f, a debt collector may not use "unfair or unconscionable means to collect or attempt to collect any debt."

286.   Servicer violated 15 U.S.C. § 1692f by the following actions:

   a. Taking nonjudicial action by recording illegal foreclosure documents such as the NOD to effect dispossession of Plaintiffs' Property and the class members properties without the legal right.

b. Charging, demanding and collecting foreclosure filing fees, foreclosure attorney fees and foreclosure recording fees. Plaintiffs have been charged thousands of dollars in foreclosure related costs and fees by Servicer which are not allowed under state and federal law.

c. Repeatedly threatening, in various letters and notifications, to take nonjudicial action to effect dispossession of Plaintiffs' and the class members properties at times and under circumstances which were and are prohibited by state and federal law.

d. Sending collection letters which had false, misleading and deceptive language regarding Plaintiffs' and the class members' right to a loss mitigation review and delaying the loss mitigation process in order to charge and collect additional costs and fees.

e. Making demands for full payment of amounts purportedly outstanding when Servicer knew that such amounts were not collectible at the time of demand.

f. Refusing to provide Plaintiffs and the class members with a single point of contact and allowing various employees to provide Plaintiffs and the class members with contradictory and false information during the loss mitigation process.

287.   As a result of the foregoing violations, Servicer is liable for statutory damages, in an amount to be determined at trial, but not less than $1,000 per violation, pursuant to 15 USC § 1692k(a)(2)(A) or, in the case of a class action, (i) such amount for each named plaintiff as could be recovered under subparagraph (A), and (ii) such amount as the court may allow for all other class members, without regard to a minimum individual recovery, not to exceed the lesser of $500,000 or 1 per centum of the net worth of the debt collector; and in the case of any successful

action to enforce the foregoing liability, the costs of the action, together with a reasonable attorney's fee as determined by the court.

288.  Plaintiffs and the class members have suffered actual damages as the proximate and actual cause and result of the violations of the FDCPA by Servicer to be determined at trial.

289.  As a result of the foregoing violations, Servicer should be enjoined from employing any of the unlawful conduct, methods, acts, or practices under the FDCPA alleged herein or proven at trial.

290.  As a result of Servicer's violations of the FDCPA, Plaintiffs and the class members are entitled to actual and statutory damages, attorney's fees, and costs, and any other relief the Court deems just and proper.

## FIFTH CAUSE OF ACTION
## VIOLATIONS OF THE FEDERAL FAIR DEBT
## COLLECTION PRACTICES ACT
## (TRUSTEE)

*(By Plaintiffs, on behalf of the proposed Nationwide Trustee Class Against Defendant Trustee, including DOES 4-6 & 7-10)*

291.  Plaintiffs reallege and incorporate by reference all previous paragraphs and allegations above as though fully set forth herein.

292.  For the purpose of 15 U.S.C. 1692(f)(6), Trustee is a "debt collector" as defined under 15 U.S.C. § 1692a(6).

293.  Trustee has engaged in acts or omissions prohibited by the FDCPA.

294.  As alleged above, Trustee's actions ignored and/or willfully violated its duties in violation of FDCPA. As such their actions establish their own independent culpability.

## Violations of 15 U.S.C. § 1692f

295.  Pursuant to 15 U.S.C. § 1692f, a debt collector may not use "unfair or unconscionable means to collect or attempt to collect any debt."

296.   Trustee violated 15 U.S.C. § 1692f(6) by the following actions:

    a.  Repeatedly threatening, in various letters and notifications, to take nonjudicial action to effect dispossession of Plaintiffs' Property at times and under circumstances which were and are prohibited by state and federal law.  Plaintiffs are informed and believe that the class members experienced the same violations.

    b.  Taking nonjudicial action by recording the NOD to effect dispossession of Plaintiffs' Property without the legal right. Plaintiffs are informed and believe that the class members experienced the same violations.

297.   At the time Trustee took the above alleged actions, Trustee had no right to possession of Plaintiffs' Property which was claimed as collateral through the Deed of Trust because said actions were prohibited by HBOR and RESPA.

298.   As a result of the foregoing violations, Trustee is liable for statutory damages, in an amount to be determined at trial, but not less than $1,000 per violation, pursuant to 15 USC § 1692k(a)(2)(A) or, in the case of a class action, (i) such amount for each named plaintiff as could be recovered under subparagraph (A), and (ii) such amount as the court may allow for all other class members, without regard to a minimum individual recovery, not to exceed the lesser of $500,000 or 1 per centum of the net worth of the debt collector; and in the case of any successful action to enforce the foregoing liability, the costs of the action, together with a reasonable attorney's fee as determined by the court.

299.   Plaintiffs and the class members have suffered actual damages as the proximate and actual cause and result of the violations of the FDCPA by Trustee to be determined at trial.

300.   As a result of the foregoing violations, Trustee should be enjoined from employing any of the unlawful conduct, methods, acts, or practices under the FDCPA alleged herein or proven at trial.

301.   As a result of Trustee's violations of the FDCPA, Plaintiffs and the class members are entitled to actual and statutory damages, attorney's fees, and costs, and any other relief the Court deems just and proper.

## SIXTH CAUSE OF ACTION

## VIOLATIONS OF THE CALIFORNIA ROSENTHAL ACT (SERVICER)

***(By Plaintiffs, on behalf of the proposed California Servicer Subclass,***

***Against Servicer, including DOES 1-3 & 7-10)***

302.   Plaintiffs reallege and incorporate by reference all previous paragraphs and allegations above as though fully set forth herein.

303.   As alleged herein, and as set forth in detail above, Servicer has committed violations of the Rosenthal Fair Debt Collection Practices Act, California Civil Code § 1788, et seq. (***"Rosenthal Act"***), which incorporates by reference, and requires compliance with, the provisions of the federal Fair Debt Collection Practices Act, 15 U.S.C. § 1692, et seq.   The FDCPA and, therefore, the Rosenthal Act, prohibits a debt collector from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692(e).

304.   Servicer is a "debt collector" within the meaning of California Civil Code § 1788.2(c) because Servicer conducted debt collection activities on Plaintiffs' and the class members' "consumer debt."    Plaintiffs and the class member are entitled to the protections of Cal. Civ. Code §§ 1788 et seq. with respect to Servicer's collection activities related to the Loan.

305.   Servicer self-identifies as a debt collector in the various letters and notices it sent to Plaintiffs and class members.   Servicer warns Plaintiffs and class members, in writing, that any information received from Plaintiffs or class members may be used for the purpose of collecting a debt.

**FIRST AMENDED CLASS ACTION COMPLAINT**

306.   Servicer, through its agents, engaged in unfair and deceptive collection practices in contravention to the Rosenthal Act. Servicer's actions alleged herein constitute violations by Servicer of Cal. Civ. Code § 1788.17.

### *Threatening to Commence Foreclosure During Prohibited Period*

307.   Servicer violated Rosenthal by threatening to take legal action and foreclose upon (i.e., sell) Plaintiffs' Property at a time and under circumstances which Servicer knew were prohibited by state and federal law.  Servicer knew it could not legally take the threatened action yet included the threat in its collection letters.  Plaintiffs are informed and believe that the class members experienced the same violations.  Servicer has a pattern and practice of using this same threat with other class members.

### *False Threat Regarding a Refusal to Evaluate Loss Mitigation Requests*

308.   Pursuant to HBOR, Servicer is obligated to review any complete loss mitigation application if the same is submitted at least 5 business days prior to a schedule foreclosure auction.

309.   Servicer repeatedly threatened in writing that it would not review a loss mitigation application from Plaintiffs if the same was not received at least 7 days prior to a scheduled foreclosure auction, which indicates a clear pattern and practice of dissuading eligible borrowers from submitting loss mitigation applications.

310.   Servicer violated Rosenthal by threatening to take an action (i.e., refusing to review valid and lawful loss mitigation requests) when Servicer knew that such action was in violation of state.  Plaintiffs are informed and believe that the class members experienced the same violations.

### *Illegal NOD – Illegal Threat of Foreclosure*

311.   Pursuant to HBOR and RESPA, Servicer was prohibited from recording the Notice of Default.

312.   Servicer recorded the NOD in the public records and used the illegal threat of foreclosure to continue its debt collection against Plaintiffs.

313.    Servicer violated Rosenthal by threatening to take legal action (continuation of the foreclosure process and setting of a foreclosure sale date) which Servicer knew was prohibited by state and federal law.  Plaintiffs are informed and believe that the class members experienced the same violations.

314.    Servicer violated Rosenthal by communicating credit information to the Trustee and to the public regarding the Notice of Default (the purported right to foreclose on the defaulted debt) which Servicer knew or should have known to be false as that action is prohibited by state and federal law.  Plaintiffs are informed and believe that the class members experienced the same violations.

*Unfair or Unconscionable Means to Collect*

*or Attempt to Collect Any Debt*

315.    Servicer violated Rosenthal by the following actions:

      a.    Charging and collecting foreclosure filing fees, foreclosure attorney fees and foreclosure recording fees for the illegal notices of default and notices of trustee's sale.  Plaintiffs have been charged thousands of dollars in foreclosure related costs and fees by Servicer which are not allowed under state and federal law. Plaintiffs are informed and believe class members have received similar charges.

      b.    Charging and collecting monthly property inspection fees. Plaintiffs have been charged for property inspection fees which are improper. Plaintiffs are informed and believe class members have received similar charges.

      c.    Taking nonjudicial action by recording illegal foreclosure documents such as the NOD and Notices of Trustee's Sale to effect dispossession of Plaintiffs' Property and the class members properties without the legal right.

d.   Repeatedly threatening, in various letters and notifications, to take nonjudicial action to effect dispossession of Plaintiffs' and the class members properties at times and under circumstances which were and are prohibited by state and federal law.

e.   Sending collection letters which had false, misleading and deceptive language regarding Plaintiffs' and class members' right to a loss mitigation review and delaying the loss mitigation process in order to charge and collect additional costs and fees.

f.   Refusing to provide Plaintiffs and the class members with a single point of contact and allowing various employees to provide Plaintiffs and the class members with contradictory and false information during the loss mitigation process.

316.   Plaintiffs and the class members have suffered actual damages as the proximate and actual cause and result of the violations of the Rosenthal Act by Servicer to be determined at trial.

317.   As a proximate result of Servicer's violations of the Rosenthal Act, Servicer is liable for actual and statutory damages, including general damages and special damages, attorney's fees, and costs, and any other such relief the Court deems just and proper and in amounts to be determined at trial pursuant to Cal. Civ. Code §§ 1788.17 and 1788.30(a).

318.   Additionally, because Servicer's violations of the Rosenthal Act were committed willingly and knowingly, Plaintiffs and the class members are entitled to recover penalties of up to $1,000 per violation as provided for in the Rosenthal Act.

319.   As a result of the foregoing violations, Servicer should be enjoined from employing any of the unlawful conduct, methods, acts, or practices under the Rosenthal Act alleged herein or proven at trial.

**SEVENTH CAUSE OF ACTION**

**VIOLATIONS OF THE CALIFORNIA ROSENTHAL ACT**

**(TRUSTEE)**

***(By Plaintiffs, on behalf of the proposed California Trustee Subclass,***

***Against Trustee, including DOES 4-6 & 7-10)***

320.   Plaintiffs reallege and incorporate by reference all previous paragraphs and allegations above as though fully set forth herein.

321.   As alleged herein, and as set forth in detail above, Trustee has committed violations of the Rosenthal Fair Debt Collection Practices Act, California Civil Code § 1788, et seq. (***"Rosenthal Act"***), which incorporates by reference, and requires compliance with, the provisions of the federal Fair Debt Collection Practices Act, 15 U.S.C. § 1692, et seq.   The FDCPA and, therefore, the Rosenthal Act, prohibits a debt collector from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692(e).

322.   Trustee is a "debt collector" within the meaning of California Civil Code § 1788.2(c) because Trustee conducted debt collection activities on Plaintiffs' and the class members' "consumer debt."    Plaintiffs and the class member are entitled to the protections of Cal. Civ. Code §§ 1788 et seq. with respect to Trustee's collection activities related to the Loan.

323.   Trustee self-identifies as a debt collector in the various letters and notices it sent to Plaintiffs and class members.   Trustee warns Plaintiffs and class members, in writing, that any information received from Plaintiffs or class members may be used for the purpose of collecting a debt.

324.   Trustee, through its agents, engaged in unfair and deceptive collection practices in contravention to the Rosenthal Act.   Trustee's actions alleged herein constitute violations by Servicer of Cal. Civ. Code § 1788.17.

325.   As alleged above, Trustee's actions ignored and/or willfully violated its duties in violation of the Rosenthal Act. As such their actions establish their own independent culpability.

### Threatening Foreclosure During Prohibited Period

326.   Trustee violated Rosenthal by threatening to take legal action and foreclose upon (i.e., sell) Plaintiffs' Property at a time and under circumstances which Trustee knew were prohibited by state and federal law.  Trustee knew it could not legally take the threatened action yet included the threat in its collection letters. Plaintiffs are informed and believe that the class members experienced the same violations.  Trustee has a pattern and practice of using this same threat with other class members.

### Illegal NOD – Illegal Threat of Foreclosure

327.   Pursuant to HBOR and RESPA, Trustee was prohibited from recording the Notice of Default.

328.   Trustee recorded the NOD in the public records and used the illegal threat of foreclosure to continue its debt collection against Plaintiffs.

329.   Trustee violated Rosenthal by threatening to take legal action (continuation of the foreclosure process and setting of a foreclosure sale date) which Trustee knew was prohibited by state and federal law.  Plaintiffs are informed and believe that the class members experienced the same violations.

### Unfair or Unconscionable Means to Collect
### or Attempt to Collect Any Debt

330.   Trustee violated Rosenthal by the following actions:

g.   Charging and collecting foreclosure filing fees, foreclosure attorney fees and foreclosure recording fees for the illegal notices of default and notices of trustee's sale.  Plaintiffs have been charged thousands of dollars in foreclosure related costs and fees by Trustee which are not allowed under state and federal law.

Plaintiffs are informed and believe class members have received similar charges.

h.   Taking nonjudicial action by recording illegal foreclosure documents such as the NOD and Notices of Trustee's Sale to effect dispossession of Plaintiffs' Property and the class members properties without the legal right.

i.   Repeatedly threatening, in various letters and notifications, to take nonjudicial action to effect dispossession of Plaintiffs' and the class members properties at times and under circumstances which were and are prohibited by state and federal law.

331.   Plaintiffs and the class members have suffered actual damages as the proximate and actual cause and result of the violations of the Rosenthal Act by Trustee to be determined at trial.

332.   As a proximate result of Trustee's violations of the Rosenthal Act, Trustee is liable for actual and statutory damages, including general damages and special damages, attorney's fees, and costs, and any other such relief the Court deems just and proper and in amounts to be determined at trial pursuant to Cal. Civ. Code §§ 1788.17 and 1788.30(a).

333.   Additionally, because Trustee's violations of the Rosenthal Act were committed willingly and knowingly, Plaintiffs and the class members are entitled to recover penalties of up to $1,000 per violation as provided for in the Rosenthal Act.

334.   As a result of the foregoing violations, Trustee should be enjoined from employing any of the unlawful conduct, methods, acts, or practices under the Rosenthal Act alleged herein or proven at trial.

**FIRST AMENDED CLASS ACTION COMPLAINT**

1

**EIGHTH CAUSE OF ACTION**

2

**NEGLIGENT LOAN SERVICING**

3

*(By Plaintiffs, on behalf of the proposed California Servicer Subclass*

4

*Against Defendant Servicer, including DOES 1-3 & 7-10)*

5

335.   Plaintiffs reallege and incorporate by reference all previous paragraphs

6

and allegations above as though fully set forth herein.

7

336.   Servicer owed a duty of due care to Plaintiffs and the class members in

8

servicing the Loan and reviewing Plaintiffs' and the class members' loss mitigation

9

applications.

10

337.   Given the servicer-borrower relationship that existed between Servicer,

11

on the one hand, and Plaintiffs and the class members, on the other hand, Servicer

12

had a duty to properly process the loan modification applications, as well as provide

13

proper notice of any rejection and appeal period as to the loss mitigation options and

14

comply with all state and federal foreclosure laws, rules and regulations rather than

15

simply proceeding with foreclosure when a loan modification and other workout

16

options are being evaluated and processed (dual tracking).

17

338.   Servicer breached its duty of due care owed to Plaintiffs and the class

18

members by the actions alleged herein including, without limitation, the following:

19

    a. Failing to send proper and accurate acknowledgment letters for

20

      documents received from Plaintiffs and the class members;

21

    b. Failing to properly safeguard and account for documents received

22

      from Plaintiffs and the class members;

23

    c. Failing to assign (and keep assigned) a competent single point of

24

      contact who complied with state and federal law;

25

    d. Failing to "exercise reasonable diligence in obtaining documents and

26

      information to complete a loss mitigation application." 12 C.F.R. §

27

      1024.41(b)(1);

28

e. Failing to identify all items needed to complete and finalize the loss mitigation applications;

f. Failing to properly process the loss mitigation applications;

g. Failing to properly communicate any issues or deficiencies with said applications;

h. Issuing and recording illegal notices of default; and

i. Making illegal demands for amounts that were not due at the time of the demand.

339. Servicer was aware that its actions alleged above and herein were specifically intended to affect Plaintiffs and class members because Servicer was responsible for the servicing of the mortgages on Plaintiffs' and class members' homes.

340. Servicer was aware that any failure to act with diligence and with due care would cause significant harm to Plaintiffs and class members because Plaintiffs and class members would be exposed to foreclosure and the associated costs and fees if Plaintiffs and class members were not properly reviewed for loss mitigation options.

341. It was substantially certain that Plaintiffs and class members would suffer injury in the event Servicer failed to act with diligence and with due care in the processing of Plaintiffs' and class members' loss mitigation requests because Servicer would file foreclosure notices and charge associated costs and fees in the event Plaintiffs and class members were not afforded the protections of state and federal law which was the responsibility of Servicer.

342. The injury suffered by Plaintiffs and class members was directly related to the Servicer's conduct set forth above.  Although Plaintiffs and class members were in mortgage default, the costs and fees along with the recording of foreclosure documents which affected Plaintiffs and class members would have been reduced or

**FIRST AMENDED CLASS ACTION COMPLAINT**

avoided entirely had Plaintiffs and class members been properly reviewed for loss mitigation options.

343.  Servicer's conduct is blameworthy as state and federal law place these obligations directly upon Servicer, but Servicer has a pattern and practice of violating said state and federal laws.

344.  The Federal and California branches of government (in enacting numerous homeowner protections, including e.g., Regulation X of RESPA and HBOR) each confirm the public policy in favor of protecting homeowners against unlawful foreclosure filings and illegal dual tracking.

345.  Servicer's breach of its duty of due care is a direct cause of damage to Plaintiffs and the class members in amounts to be determined at trial.

346.  Servicer is not acting in a role as a "lender of money" but rather as the direct conduit between the lender and the borrower with all the obligations set forth upon a mortgage servicer under RESPA and HBOR. Servicer has an obligation to follow all applicable state and federal laws, and keep the customer updated as to the current status of their contractual relationship.  Servicer failed across the board in this regard and as such has negligently performed its duty, breached several state and federal laws, thus harming Plaintiffs and the class members.

347.  Plaintiffs and the class members have been injured in that the foreclosure process was unlawfully initiated against their homes and Plaintiffs are now subject to imminent foreclosure; Plaintiffs and the class members expended considerable time, energy, and effort in preparing their financial information for their loss mitigation application, as well as considerable time and effort preparing, providing, and vouching for the truth of their financial information; Plaintiffs' and the class members' credit was severely damaged; thousands of dollars in foreclosure attorney's fees, excess interest, late fees, foreclosure fees, and other improper amounts were added to Plaintiffs' Loan balance and arrears that keep increasing due to Servicer's misconduct; Plaintiffs and the class members have expended additional

amounts, according to proof at the time of trial, all in excess of the jurisdictional minimum of this Court.

## NINTH CAUSE OF ACTION

## UNFAIR PRACTICES UNDER CALIFORNIA BUSINESS

## & PROFESSIONS CODE SECTION 17200, ET SEQ.

*(By Plaintiffs, on behalf of the proposed California Servicer Class & California Trustee Class Against All Defendants, including DOES 1-3 & 4-6 & 7-10)*

348.   Plaintiffs reallege and incorporate by reference all previous paragraphs and allegations above as though fully set forth herein.

349.   The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising.

350.   As alleged above, Trustee's actions ignored and/or willfully violated its duties in violation of numerous state and federal laws. As such their actions establish their own independent culpability.

351.   A business practice is "unlawful" if it violates any established state or federal law. Plaintiffs and class members allege herein above that Defendants have violated the following state and federal laws:

i.   12 C.F.R. § 1024.41(b)(1)

j.   12 C.F.R. § 1024.41(b)(2)

k.   12 C.F.R. § 1024.41(c)(1)

l.   12 C.F.R. § 1024.41(c)(2)(iii)

m. 12 C.F.R. § 1024.41(c)(2)(iv)

n.   12 C.F.R. § 1024.41(c)(2)(v)

o.   12 C.F.R. 1024.41(c)(3)

p.   12 C.F.R. 1024.41(d)

q.   12 C.F.R. 1024.41(h)

r.   12 C.F.R. § 1024.41(f)(2)

s.   15 U.S.C. § 1692e

t.   15 U.S.C. § 1692f

u.   Cal. Civ. Code § 2923.6

v.   Cal. Civ. Code § 2923.7

w.   Cal. Civ. Code § 2924.10

x.   Cal. Civ. Code § 2924.11

y.   Cal. Civ. Code § 2924.17

z.   Cal. Civ. Code § 1788, et seq.

### *Violations of 12 C.F.R. § 1024.40*

352.   In additional to the violations set forth above, Servicer as also violated 12 C.F.R. § 1024.40. Pursuant to 12 C.F.R. § 1024.40, Servicer was required to designate a point of contact (a ***"POC"***) to Plaintiffs' and the class members' file within 45 days of the first missed payment and to make such POC available to Plaintiffs and the class members via telephone.  The POC was required to provide Plaintiffs and the class members with accurate information about the loss mitigation options available and the actions required to be evaluated for such loss mitigation. The POC was required to provide Plaintiffs and the class members with accurate information about the status of any loss mitigation application that was submitted to the Servicer.

353.   Servicer violated 12 C.F.R. § 1024.40 by failing to assign a POC to Plaintiffs within 45 days of when Plaintiffs went into default.  Plaintiffs are informed and believe that the class members experienced the same violations.

354.   Servicer violated 12 C.F.R. § 1024.40 by failing to provide Plaintiffs a means of contacting a POC and by failing to require a POC to make timely contact with Plaintiffs regarding the status of their Loss Mitigation Application.  As alleged herein, Plaintiffs attempted to make contact with a POC on numerous occasions and were never able to make direct contact and never received a timely and accurate response from a POC.  Rather, Servicer had random employees make contact with

Plaintiffs and/or had unidentified persons mail notices to Plaintiffs regarding the Loss Mitigation Application. Plaintiffs are informed and believe that the class members experienced the same violations.

355. Servicer violated 12 C.F.R. § 1024.40 by having random employees contact Plaintiffs where such employees were unfamiliar with Plaintiffs' Loss Mitigation Application. Plaintiffs were forced to speak with many customer service representatives, none of whom were familiar with the file. As alleged herein, Plaintiffs received false, misleading, inaccurate and inconsistent information about the status of the Loss Mitigation Application and what items and documents were required to complete a review of the same. Plaintiffs are informed and believe that the class members experienced the same violations.

356. Further, each representative Plaintiffs spoke with failed to act as a POC for Plaintiffs, either individually or as a team of personnel, because each such representatives gave false, misleading, inaccurate, and inconsistent information regarding Plaintiffs' Loss Mitigation Application. Servicer violated 12 C.F.R. § 1024.40 by failing to provide Plaintiffs with a POC because Servicer's agents and employees, either individually or as an alleged team, failed to comply with any requirement imposed by 12 C.F.R. § 1024.40. Plaintiffs are informed and believe that the class members experienced the same violations.

357. Finally, although 12 C.F.R. § 1024.40 does not set forth an explicit private right of action, numerous Courts have held that violations of that nature may serve as the predicate unlawful activity under the UCL. *Loeffler v. Target Corp.*, 58 Cal. 4th 1081, 1124 (2014); *see VP Racing Fuels, Inc. v. General Petroleum Corp.*, 673 F. Supp. 2d 1073, 1081 (E.D. Cal. 2009).

### *Violations of 12 C.F.R. § 1024.38*

358. Pursuant to 12 C.F.R. § 1024.38, Servicer is required to "maintain policies and procedures that are reasonably designed to achieve" certain pro-borrower objectives set forth in § 1024.38(b).

359.   Servicer violated 12 C.F.R. § 1024.38(b)(1) "***Accessing and Providing Timely and Accurate Information***" by, among other things:

a.   Failing to provide accurate and timely disclosures to Plaintiffs and class members prior to and during the loss mitigation process; § (b)(1)(i)

b.   Submitting documents or filings required for a foreclosure process (i.e. the NOD), which failed to reflect accurate and current information and which violated state and federal law; § (b)(1)(v)

360.   Servicer violated 12 C.F.R. § 1024.38(b)(2) ***"Properly Evaluating Loss Mitigation Applications"*** by, among other things:

a.   Failing to provide accurate information to Plaintiffs and class members regarding loss mitigation options available to Plaintiffs and class members from the owner or assignee of their mortgage loans; §(b)(2)(i)

b.   Failing to identify with specificity all loss mitigation options for which Plaintiffs and class members may be eligible; (b)(2)(ii)

c.   Failing to provide prompt access to all documents and information submitted by Plaintiffs and class members in connection with a loss mitigation option to servicer personnel that are assigned to assist the borrower pursuant to § 1024.40, said failure being evidence by contradictory instruction and direction to Plaintiffs and class members from various Servicer employees regarding previously submitted documents and repeated false and misleading requests for phantom missing documents; § (b)(2)(iii)

d.   Failing to identify documents and information that Plaintiffs and class members were required to submit to complete a loss mitigation application and facilitate compliance with the notice required pursuant to § 1024.41(b)(2)(i)(B); §(b)(2)(iv)

e.   Failing to properly evaluate Plaintiffs and class members for all loss mitigation options for which Plaintiffs and class members may be eligible in accordance with the requirements of § 1024.41. §(b)(2)(v)

**FIRST AMENDED CLASS ACTION COMPLAINT**

361.   Defendants engaged in unfair acts in violation of Business and Professions Code section 17200 by the following conduct:

- Defendants failed to comply with California law and specifically committed illegal dual tracking on Plaintiffs' Property and the homes of the class members.

- Defendants failed to comply with Federal law under Regulation X of RESPA and specifically committed illegal dual tracking on Plaintiffs' Property and the homes of the class members.

- Defendants illegally threatened foreclosure on Plaintiffs' Property and the homes of the class members in violation of HBOR and RESPA.

- Defendants "dual tracked" Plaintiffs and class members into foreclosure while their complete loss mitigation applications remained pending in violation of RESPA and HBOR.

- Servicer failed to provide, and keep assigned, a proper point of contact as required by HBOR and RESPA.

- Servicer misled Plaintiffs and the class members into believing that Servicer intended to comply with state and federal law but, in fact, Servicer continued to dual-track Plaintiffs and the class members into foreclosure.

- Defendants illegally recorded notices of default against Plaintiffs' and the class members properties in violation of RESPA and HBOR.

- Servicer failed to acknowledge receipt of Plaintiffs' complete loss mitigation application in violation of RESPA and HBOR.  Plaintiffs are informed and believe that the class members experienced the same violations.

**FIRST AMENDED CLASS ACTION COMPLAINT**

- Servicer failed to properly identify any purported missing documents in Plaintiffs' and the class members' loss mitigation applications in violation of RESPA and HBOR.

- Servicer repeatedly falsely identified missing documents which were already submitted by Plaintiffs and class members.

- Servicer purposefully delayed the loss mitigation process in order to increase the Servicer's profits by charging various costs and fees to Plaintiff's and class members' mortgage balance making loan modification impossible.

- Servicer failed to provide a Single Point of Contact with the power to postpone the trustee's sale in violation of Civil Code § 2923.7.

- Servicer made improper demands for payment of amounts that were not due and made improper threats in the collection of debt that was not due at the time of the demand.

362.   Defendants' acts, omissions, misrepresentations, customs, practices and non-disclosures as set forth in this Complaint, whether or not in violation of any law, are otherwise unfair, unconscionable, unlawful and fraudulent.

363.   Plaintiffs and the class members have been injured and harmed directly by the acts of Defendants, and each of them, committed in violation of Business and Professions Code Section 17200 in that Plaintiffs and class members have been charged costs and fees associated with foreclosure, title to their homes has been clouded by the recorded foreclosure documents which makes refinance impossible, the default amount on their mortgages have increased based upon the delay caused by the foreclosure and the costs associated therewith making loan modification impossible and they had to retain counsel and pay costs and fees in prosecuting their claims hereunder.  As a result, Plaintiffs and the class members have suffered actual harm and damage including, without limitation:

a.  Plaintiffs have been charged over $1,000 in foreclosure related costs and fees by Servicer as a direct result of Servicer's violations of Regulation X. Plaintiffs are informed and believe that the class members experienced the same or similar damages.

b.  Plaintiffs have been assessed over $100 in "property inspection fees" by Servicer as a direct result of Servicer's violations of Regulation X. Plaintiffs are informed and believe that the class members experienced the same or similar damages.

c.  Plaintiffs and class members lost other available loss mitigation options such as refinance, bankruptcy or curing the default while waiting for viable loss mitigation options which were available to them from Servicer and the mortgage holders but which were not evaluated by Servicer.

d.  Plaintiffs and class members were charged significant costs and fees which increased their mortgage balance, including, without limitation, late fees, foreclosure filing fees, inspection fees, and foreclosure attorney and trustee fees all of which made loan modification impossible.

e.  Plaintiffs and class members incurring out-of-pocket costs for responding to the erroneous demands from Servicer's employees, including, without limitation, printing, scanning, faxing, mailing and travel costs associated with redundant and unnecessary document production.

f.  Had Defendants not violated § 17200, Plaintiffs and class members would not have been charged illegal foreclosure filing fees which made a successful loan modification impossible.

g.  Had Defendants not violated § 17200, Plaintiffs and class members would have been able to avoid illegal dual tracking and

the illegal clouding of title to their homes which precluded options to refinance their mortgages.

h.   Had Defendants not violated § 17200, Plaintiffs and class members would not have suffered extended delays in the loss mitigation process which increased their mortgage balances and made loan modification impossible.

i.   Had Defendants not violated § 17200, Plaintiffs and class members would have been properly reviewed and approved for an available loss mitigation option and stopped ongoing default charges and the associated costs and fees.

364.   Plaintiffs and the class members have and will in the future, incur expenses and costs which Plaintiffs and the class members are entitled to recover. Plaintiffs and the class members are therefore entitled to injunctive relief and attorney's fees as available under California Business and Professions Code § 17200 and related sections.   These acts and practices, as described in the previous paragraphs, are unfair and violate Business and Professions Code § 17200 because their policies and practices described above violate all the statutes previously listed, and consequently, constitute an unlawful business act of practice within the meaning of Business and Professions Code §17200.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the class members pray for judgment as follows:

1.   For an order certifying the proposed class(es);

2.   For an injunction prohibiting the Defendants from taking any further foreclosure action against the Property or issuing or recording any notice of trustee's sale or any trustee's deed upon sale resulting from any such trustee's sale of the Property;

3.   For such other and further injunctive relief as is necessary to stop further dual tracking against the Plaintiffs' and the class members' homes;

4.  For Actual damages according to proof;

5.  For General damages according to proof;

6.  For Statutory damages as permitted by law;

7.  For double or treble damages as permitted by law;

8.  For costs of suit incurred herein;

9.  For attorneys' fees incurred herein as permitted by law; and

10. For such other and further relief as the Court may deem just and proper

**DEMAND FOR JURY TRIAL**

Plaintiffs demand trial by jury of all claims so triable as a matter of right.

Dated: April 29, 2021                                VANTIS LAW FIRM

By: _____
Derik N. Lewis
Attorneys for Plaintiffs

**FIRST AMENDED CLASS ACTION COMPLAINT**